**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville Division**

| | | |
|---|---|---|
| Victor Ashe, Phil Lawson, and the League of Women Voters of Tennessee, | ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | Case No. 3:23-cv-01256 |
| | ) | Judge Eli J. Richardson |
| Tre Hargett, in his official capacity as | ) | Magistrate Judge Alistair Newbern |
| Tennessee Secretary of State; Mark Goins, in | ) | |
| his official capacity as Tennessee | ) | |
| Coordinator of Elections; and Jonathan | ) | |
| Skrmetti, in his official capacity as | ) | |
| Tennessee Attorney General, | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

# Table of Contents

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ..................................................................................... 5

   I.   The Plaintiffs ..................................................................................... 5

   II.   Modern Primaries in Tennessee ....................................................... 10

   III.   Statutory Background and History ................................................... 12

STANDARD OF REVIEW ................................................................................... 14

ARGUMENT ...................................................................................................... 15

   I.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ...................................... 15

      A.   Plaintiffs Are Likely to Succeed in Demonstrating that Section 115(b) Is Void for Vagueness. ................................................................................... 15

      B.   Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim. ... 21

   II.   A Preliminary Injunction Is Necessary. ........................................................... 25

      A.   Plaintiffs Will Suffer Immediate and Irreparable Harm If Sections 115(b) and 115(c) Remain in Effect. ................................................................... 25

      B.   The Balance of Equities Weigh in Plaintiffs' Favor and Issuance of the Preliminary Injunction Is in the Public Interest. ...................................... 25

      C.   A Statewide Injunction Is Necessary. ................................................. 27

**CONCLUSION** ................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty.*,
796 F.3d 636 (6th Cir. 2015) ................................................... 27

*Bd. of Airport Comm'rs v. Jews for Jesus*,
482 U.S. 569 (1987) .......................................................... 21, 24

*Belle Maer Harbor v. Charter Twp. of Harrison*,
170 F.3d 553 (6th Cir. 1999) ................................................... 16

*Boos v. Barry*,
485 U.S. 312 (1988) ............................................................. 23

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ............................................................. 22

*Brockett v. Spokane Arcades, Inc.*,
472 U.S. 491 (1985) ............................................................. 21

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................. 28

*City of Chicago v. Morales*,
527 U.S. 41 (1999) .............................................................. 21

*Clemons v. Board of Educ. of Hillsboro, Ohio*,
228 F.2d 853 (6th Cir. 1956) ................................................... 14

*Connection Distrib. Co. v. Reno*,
154 F.3d 281 (6th Cir. 1998) ................................................... 25

*D.T. v. Sumner Cty. Sch.*,
942 F.3d 324 (6th Cir. 2019) ................................................... 15

*Dambrot v. Cent. Mich. Univ.*,
55 F.3d 1177 (6th Cir. 1995) ................................................... 19

*FemHealth USA, Inc. v. City of Mt. Juliet*,
458 F. Supp. 3d 777 (M.D. Tenn. 2020) ......................................... 27

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) .................................................. 28

*Forsyth Cnty, Ga. v. Nationalist Movement*,
    505 U.S. 123 (1992)................................................................22, 23

*Gonzalez v. Nat'l Bd. of Medical Exam'rs*,
    225 F.3d 620 (6th Cir. 2000) .................................................15

*Grossman v. City of Portland*,
    33 F.3d 1200 (9th Cir. 1994) .................................................25

*Hunter v. Hamilton County Board of Elections*,
    635 F.3d 219 (6th Cir. 2011) .................................................28

*Johnson v. United States*,
    576 U.S. 591 (2015).......................................................3, 15, 19

*Kolender v. Lawson*,
    461 U.S. 352 (1983)...............................................................15

*League of Women Voters of Ohio v. Brunner*,
    548 F.3d 463 (6th Cir. 2008) .................................................16

*Martin-Marietta Corp. v. Bendix Corp.*,
    690 F.2d 558 (6th Cir. 1982) .................................................27

*Memphis A. Philip Randolph Inst. v. Hargett*,
    978 F.3d 378 (6th Cir. 2020) .................................................14

*Memphis A. Phillip Randolph Inst. v. Hargett*,
    482 F. Supp. 3d 673 (M.D. Tenn.), *aff'd on other grounds,* 978 F.3d 378 (6th
    Cir. 2020) ..............................................................................16

*Miller v. City of Cincinnati*,
    622 F.3d 524 (6th Cir. 2010) ...............................15, 18, 19, 27

*Minn. Voters All. v. Mansky*,
    138 S. Ct. 1876 (2018).........................................3, 23, 24, 25

*Nat'l Viatical, Inc. v. Universal Settlements, Int'l, Inc.*,
    716 F.3d 952 (6th Cir. 2013) .................................................15

*New York v. Ferber*,
    458 U.S. 747 (1982)...............................................................22

*Newsom v. Norris*,
    888 F.2d 371 (6th Cir. 1989) .................................................25

*Newsom v. Tenn. Republican Party*,
    647 S.W.3d 382 (Tenn. 2022)...........................................18, 19

iii

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ..............................................................4, 25

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't*,
  305 F.3d 566 (6th Cir. 2002) ..................................................................15

*Patio Enclosures, Inc. v. Herbst*,
  39 F. App'x 964 (6th Cir. 2002) ..............................................................15

*Project Vote v. Blackwell*,
  455 F. Supp. 2d 694 (N.D. Ohio 2006)....................................................25

*Purcell v. Gonzalez*,
  549 U.S. 1, 127 S. Ct. 5, 166 L. Ed. 2d 1 (2006)....................................28

*Sec'y of State of Md. v. Munson Co., Inc.*,
  467 U.S. 947 (1984).................................................................................22

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018).............................................................................21

*Six Clinic Holding Corp., II v. Cafcomp Systems*,
  119 F.3d 393 (6th Cir. 1997) ..................................................................15

*Tenn. State Conf. of N.A.A.C.P. v. Hargett*,
  420 F. Supp. 3d 683 (M.D. Tenn. 2019)...............................4, 20, 24, 26

*United Food & Comm. Workers Union Union v. Sw. Ohio Reg'l Transit Auth.*,
  163 F.3d 341 (6th Cir. 1998) ..............................................................19, 20

*United States v. Williams*,
  553 U.S. 285 (2008).................................................................................23

*Village of Hoffman Estates v. Flipside*,
  455 U.S. 489 (1982).............................................................................16, 28

*Virginia v. Hicks*,
  539 U.S. 113 (2003).................................................................................3, 22

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008).................................................................................22

**Statutes**

Tennessee Code Annotated § 2-2-142 (h) ..................................................9, 26

Tennessee Code Annotated § 2-7-115(c).......................................................14

Tennessee Code Annotated § 2-13-104 .........................................................18

Tennessee Code Annotated § 2-19-102 ..................................................................12

Tennessee Code Annotated § 2-19-107 ..................................................................12

**Other Authorities**

*Affiliate*, Black's Law Dictionary (4th ed. 1968).........................................................17

*Affiliate*, Oxford English Dictionary.....................................................................17

*Allegiance*, Black's Law Dictionary (4th ed. 1968) .....................................................17

*Allegiance*, Black's Law Dictionary (11th ed. 2019) ...................................................17

First Amendment ............................................................................ *passim*

Second Amendment ....................................................................................23

Black's Law Dictionary (both today and in the operative version when the statute
    was enacted, in 1972)...........................................................................17

*Bona Fide*, Black's Law Dictionary (4th ed. 1968).....................................................17

*Bona Fide*, Black's Law Dictionary (11th ed. 2019)...................................................17

Chris Cillizza, *Donald Trump Just Savaged An(other) American Hero* ........................................3

"Election Results" for Knox County,
    https://www.knoxcounty.org/election/electionresults.php....................................................10

*G.O.P. Chaos Winds Up With Speaker Nominee No. 4*, N.Y. Times, Oct. 25, 2023 ....................2

Georgiana Vines, *Candidate who was kicked off GOP ballot is from notable
    Knoxville family*, Knoxville News Sentinel, Apr. 26, 2022....................................................3

Karoun Demirjian, *Menendez Rejects Democrats' Calls to Resign, Prompting
    Talk of Expulsion*, N.Y. Times, Sept. 28, 2023 ...............................................3

Michael Gold et al., *George Santos to Keep Seat After House Votes Not to Expel
    Him*, N.Y. Times, Nov. 1, 2023 ...........................................................3

November 8, 2022 Election Results (Certified),
    https://www.nashville.gov/departments/elections/election-results-and-
    statistics/election-results/221108 .......................................................11

Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853 (1991).........................22

v

State and Federal General & Bartlett, Collierville, Germantown, Lakeland and
    Millington municipal - 11.8.2022,
    https://www.electionsshelbytn.gov/elections/state-and-federal-general-bartlett-
    collierville-germantown-lakeland-and-millington ...................................................................11

*Tennessee Republican Party Upholds Williamson County Primary Results*,
    Tennessee Outlook, Jun. 10, 2022,
    https://tennesseelookout.com/briefs/tennessee-republican-party-upholds-
    williamson-county-primary-results/ ..........................................................................................13

*Trump RINO Test Is Ridiculous*, Politico, Mar. 23, 2023,
    https://www.politico.com/news/magazine/2023/03/23/trump-republicans-rino-
    00088285 .........................................................................................................................................2

WNBJ, Apr. 21, 2022, https://www.wnbjtv.com/single-post/tennessee-secretary-
    of-state-tre-hargett-speaks-at-jackson-rotary-club-luncheon ...................................................13

## PRELIMINARY STATEMENT

Plaintiffs Victor Ashe ("Mr. Ashe"), Phil Lawson ("Mr. Lawson"), and the League of Women Voters of Tennessee ("LWVTN" or the "League") seek a preliminary injunction from this Court (1) enjoining prosecution under Tennessee Code Annotated § 2-7-115(b) and the related enforcement statutes, Tennessee Code Annotated §§ 2-19-102 and 2-19-107, and (2) enjoining enforcement of Tennessee Code Annotated § 2-7-115(c).[1]

Section 115(b) is an unconstitutionally vague criminal law that threatens voters with felony convictions based on nebulous standards that have no definition under state law. Section 115(c) compounds the constitutional problems created by Section 115(b) by mandating that all polling locations post signs with bolded language in advance of the upcoming 2024 primary election warning voters that they are committing a crime if they violate Section 115(b)—even though there is no way for voters to know whether they are in compliance with the law. These provisions leave Plaintiffs and thousands of other Tennesseans unable to determine whether voting in a primary will subject them to prosecution and jail time, and, thus, will deter a potentially enormous number of voters from exercising their fundamental right to vote. Plaintiffs therefore bring this facial challenge to both provisions and ask this Court to enjoin Defendants from enforcing them.

Section 115(b) requires that, to vote in a party's primary election, a person must be a "bona fide member of and affiliated with" that party or "declare[ ] allegiance" to it, or else face criminal prosecution. Section 115(c), enacted only months ago, requires that prominent notices be posted at all polling places to warn voters that they will be subject to prosecution if they are not a "bona

---

[1] Pursuant to local rule 7.01(a)(1) counsel for Plaintiffs conferred with counsel for Defendants, and Defendants oppose Plaintiffs' Motion for a Preliminary Injunction.

1

fide member of or affiliated with that political party,"[2] or do not "declare allegiance to that party[.]" The problem is that neither Section 115 nor any other provision of Tennessee law defines what it means to be a "bona fide" member of a party, nor how that differs from "affiliation," nor how one can "declare allegiance" to a party in a manner that will guard against prosecution. Furthermore, the political parties themselves do not concretely define these terms in their bylaws and, even if they did, the Constitution does not permit private political parties to set the scope of criminal conduct. And, unlike in other states, voters in Tennessee cannot formally register as a member of any state political party—*i.e.*, there are no rolls a voter might consult to ensure they have selected the "right" party's ballot upon arriving at the polls.

Section 115(b) has been on Tennessee's books since the 1970s without any known prosecutions. But the Legislature's recent enactment of Section 115(c), combined with prominent threats by Tennessee's Secretary of State, Defendant Tre Hargett, to seek indictments for violations of both subsections in connection with the next primary elections, means that Plaintiffs Ashe and Lawson, and Plaintiff LWVTN's members are in danger of prosecution under this regime. In the current political climate—where a single critique of a former president can subject even lifetime party stalwarts to derision as "RINOs" (to use an example of a Republican term) and exile from party membership,[3] and where state and nationwide parties often seek to expel their members for

---

[2] Section 115(c) requires polling places to post an incorrect statement of the law—substituting subsection (b)'s "and" for an erroneous "or." As discussed below, that manifest misstatement of the law is itself sufficient reason for this Court to enjoin enforcement of section 115(c) as written.

[3] *See* Carl Hulse, *Another Day of G.O.P. Chaos Winds Up With Speaker Nominee No. 4*, N.Y. Times, Oct. 25, 2023, https://www.nytimes.com/2023/10/25/us/politics/house-republicans-speaker.html ("Mr. Trump took aim at Mr. Emmer on social media, leveling the deadly charge that he was a RINO—Republican in name only—and unfit for the speakership."); Rich Lowry, *The Trump RINO Test Is Ridiculous*, Politico, Mar. 23, 2023, https://www.politico.com/news/magazine/2023/03/23/trump-republicans-rino-00088285 (commenting on the "stalwart Republicans" that Trump has derided as RINOs, including Rep. Liz Cheney, U.S. Attorney General Bill Barr, Arizona Governor Doug Ducey, Georgia Governor Brian

conduct having little to do with genuine belief in the party's platform[4]—it is impossible for voters to have confidence that their "bona fides" are sufficient to avoid prosecution come voting day. That is particularly true given the lack of any objective resource that would tell voters—who may have lawfully voted in primaries for both parties previously, or who may be voting for the first time—whether they are "bona fide" members of *any* party. The upcoming Presidential primary elections of both political parties are therefore about to be profoundly impacted by this unconstitutionally vague statute. Preliminary injunctive relief is therefore urgently needed.

This Court should grant Plaintiffs' request for a preliminary injunction for three reasons. *First*, Plaintiffs are likely to succeed on the merits of their constitutional claims. This statute is void for vagueness—*i.e.*, it violates the Fourteenth Amendment's due process clause because it "fail[s] to give ordinary people fair notice" of what is proscribed and is "so standardless that [it] invite[s] arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). This statute also—through threats of prosecution based on nebulous and unknowable standards—violates the First Amendment's overbreadth doctrine, as it will deter a far greater range of protected voting conduct than could be needed to protect against any conceivable threat of malicious cross-over voting. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018); *Virginia v. Hicks*, 539 U.S.

---

Kemp, and Florida Governor Ron DeSantis); Chris Cillizza, *Donald Trump Just Savaged An(other) American Hero*, CNN, Oct. 25, 2021 (Trump calling John McCain "a RINO's RINO").

[4] *See* Michael Gold et al., *George Santos to Keep Seat After House Votes Not to Expel Him*, N.Y. Times, Nov. 1, 2023, https://www.nytimes.com/2023/11/01/nyregion/george-santos-expulsion-house.html; Karoun Demirjian, *Menendez Rejects Democrats' Calls to Resign, Prompting Talk of Expulsion*, N.Y. Times, Sept. 28, 2023, https://www.nytimes.com/2023/09/28/us/menendez-democrats-senate.html; *see also* Georgiana Vines, *Candidate who was kicked off GOP ballot is from notable Knoxville family*, Knoxville News Sentinel, Apr. 26, 2022, https://www.knoxnews.com/story/news/columnists/georgiana-vines/2022/04/25/baxter-lee-kicked-off-gop-ballot-has-knoxville-ties-georgiana-vines/7413476001/ (Republican party stripped Baxter Lee from the Fifth Congressional District primary ballot in 2022 despite Lee's contributions of more than $100,000 to Republican candidates).

3

113, 119 (2003) (overbreadth doctrine responds to "threat [that] enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions."); *accord Tenn. State Conf. of N.A.A.C.P. v. Hargett*, 420 F. Supp. 3d 683, 698-99 (M.D. Tenn. 2019) (First Amendment was violated when the "threat of penalties [wa]s likely to have a chilling effect on" voting-related activities).

*Second*, absent injunctive relief, Sections 115(b) and 115(c) will cause immediate and irreparable harm to Plaintiffs and other similarly situated voters. *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is *presumed*." (emphasis added)). In the next primary, Plaintiffs will not be able to navigate how to vote without unreasonably risking prosecution. This will lead Plaintiffs and others either to simply *not* vote or risk criminal prosecution for exercising their fundamental right to vote. The Constitution prohibits the State from putting voters in such a dilemma.

*Third*, the balance of the equities and the public interest both weigh heavily in favor of a preliminary injunction. Together, Sections 115(b) and 115(c) deprive Plaintiffs of constitutional rights, without advancing any legitimate state interest. Rather, it is in the public interest to protect the fundamental right to vote in local, state, and federal elections, and to ensure that eligible Tennessee voters do not have their rights chilled by a vague and unconstitutional law.

## I.    The Plaintiffs

Plaintiffs Ashe and Lawson are Tennesseans from opposing political parties. Dkt. No. 1 ("Compl.") ¶¶ 15–16; Ex. A, Declaration of Victor Ashe ("Ashe Decl."), ¶ 7; Ex. B, Declaration of Phil Lawson ("Lawson Decl."), ¶ 5. Victor Ashe, a Republican, was first elected to the Tennessee House in 1968 and then joined the Tennessee Senate in 1975 as the youngest-ever elected state senator in Tennessee history. Compl. ¶ 15; Ashe Decl. ¶ 3. In 1984, he ran as the Republican nominee for United States Senate against Al Gore. Compl. ¶ 15; Ashe Decl. ¶ 3. Mr. Ashe was subsequently elected Mayor of Knoxville in 1987—officially a non-partisan position— and served until 2003. Compl. ¶ 15; Ashe Decl. ¶ 5. He was then appointed by President George W. Bush to be Ambassador to Poland. Compl. ¶ 15; Ashe Decl. ¶ 6.

Phil Lawson, a Democrat, is a real estate developer with a focus on providing affordable housing and a civic leader in Tennessee. Compl. ¶ 16; Lawson Decl. ¶¶ 2–5. The Lawson Family Foundation that he established provides substantial economic support to renew urban centers and provide economic mobility to Tennessee's poorest residents; increase literacy; expand access to nutrition; facilitate pathways to college and careers for those traditionally unable to obtain those goals; and combat human trafficking and domestic violence. Compl. ¶ 16; Lawson Decl. ¶ 3. Mr. Lawson is also a significant donor to the University of Tennessee and one of the largest donors to the Democratic Party in Tennessee. Compl. ¶ 16; Lawson Decl. ¶¶ 4, 6.

Consistent with longstanding American tradition, both Mr. Ashe and Mr. Lawson have a history of criticizing their own parties and sometimes offering support for candidates of the other party. Compl. ¶¶ 15–16; Ashe Decl. ¶¶ 8–9. Mr. Ashe, for instance, maintains a weekly column where he has criticized former President Trump and other Tennessee Republicans, such as Representative Tim Burchett, whom Mr. Ashe recently chastised for his vote to remove Speaker

5

Kevin McCarthy. Compl. ¶ 15; Ashe Decl. ¶ 8. Mr. Ashe is also a forceful critic of Republicans who refused to certify the results of the 2020 election and who have not condemned the actions of January 6, 2021. Compl. ¶ 15; Ashe Decl. ¶ 9. Likewise, Mr. Lawson does not exclusively support Democrats. Compl. ¶ 16; Lawson Decl. ¶¶ 7–8. He has donated to and voted for Republican candidates, such as conservative Republican Janet Testerman in her candidacy for the Tennessee General Assembly. Compl. ¶ 16; Lawson Decl. ¶¶ 7–8. Despite their longstanding identification with their respective parties, neither Mr. Ashe nor Mr. Lawson is certain, given Section 115(b)'s vague terms, the lack of a definition in party bylaws, and the political climate, that he can vote without fear of prosecution. Compl. ¶¶ 15–16; Ashe Decl. ¶ 10; Lawson Decl. ¶ 9.

Plaintiff LWVTN is a nonprofit, nonpartisan, grassroots, membership-based political organization whose mission is to empower voters and defend democracy. Compl. ¶ 17; Ex. C, Declaration of Debby Gould ("Gould Decl."), ¶ 4. LWVTN is part of the League of Women Voters of the United States and has over 1,000 members statewide, spread out amongst ten local League chapters across Tennessee, as well as at-large members located across the state. Compl. ¶ 18; Gould Decl. ¶ 5. LWVTN seeks to promote civic engagement through informed and active participation in government. Compl. ¶ 17; Gould Decl. ¶ 7. It accomplishes this mission in part by helping Tennessee citizens register to vote, educating voters about the issues, and encouraging voters to be active participants in democracy by engaging with elected officials and their policy decisions. Compl. ¶ 17; Gould Decl. ¶ 7. Additionally, LWVTN focuses on expanding opportunities for voter participation and believes voters should have a reasonable opportunity to elect candidates of their choice. Gould Decl. ¶ 7.

In pursuit of its core goal of informing and engaging voters, LWVTN and its local chapters prepare a range of easy-to-understand non-partisan materials that are accessible to the public. Gould Decl. ¶ 8. During election seasons, LWVTN also sees an uptick in the number of requests

6

by phone or by email from members of the public with specific questions regarding their own eligibility to vote or their access to a ballot. *Id.* ¶ 9. LWVTN also provides VOTE411.org as a service to the public. *Id.* ¶ 11. A national initiative of the League of Women Voters Education Fund ("LWVEF"), VOTE411.org is designed to provide all voters with the information they need to successfully participate in every election (local, state, and federal) because the League believes that laws and policies should reflect the values of the community. *Id.* It provides all the necessary dates and guidelines for voting in Tennessee, and it offers a Ballot Lookup Tool for voters to enter their addresses to find their local polling place and create a personalized voter guide to take with them on election day for in-person voting. *Id.* In 2022, over 84,000 Tennesseans used LWVTN's VOTE411.org to get reliable voter information. Compl. ¶ 17; Gould Decl. ¶ 11.

LWVTN has a diverse membership along racial, ethnic, socioeconomic, religious, and political lines. Compl. ¶ 18; Gould Decl. ¶ 6. LWVTN's members are active in the political process, and many of its voters usually vote in primary elections. Gould Decl. ¶ 6; *see also* Compl. ¶ 17. As a nonpartisan organization that does not support candidates or parties, LWVTN does not inquire about members' political affiliations or how members vote; nevertheless, LWVTN has reason to believe it has many members who self-identify as Democrats, many other members who self-identify as Republicans, and many other members who self-identify as independent voters, all of whom may be subject to prosecution given the vague terms of the statute. Compl. ¶ 18; Gould Decl. ¶¶ 4, 6. Other members have donated to members of both the Democratic and Republican political parties. Gould Decl. ¶ 18. Because Sections 115(b) and (c) fail to define what makes someone a "bona fide" party member, there will be confusion for these members about whether they can vote in the primary election under the law. *Id.* ¶ 19.

As with Plaintiffs Ashe and Lawson, Sections 115(b) and 115(c) are likely to prevent some League members from voting. Compl. ¶ 18; Gould Decl. ¶¶ 13–14. The implementation of Section

115(c) will change polling places in primary elections. *Id.* ¶ 12. Section 115(c)'s requirement that a sign must be posted at all polling places warning that a voter must be a "bona fide," "affiliated," or "allegian[t]" party member to legally vote in that party's primary election will create confusion and could intimidate and deter potential voters from voting for fear of prosecution. *Id.* ¶¶ 13–14, 18. Because Section 115 does not define what it means to be a "bona fide," "affiliated," or "allegian[t]" party member, and poll officers are not allowed to provide any clarification about the meaning of these terms, the Section will erode public confidence in the voting process. *Id.* ¶ 17; *see also* Gould Decl. ¶¶ 27-28 (noting the worry LWVTN members who serve as poll workers have about questions they will be unable to answer related to Section 115).

Further, given the League's mission and activities to educate and assist voters, the statute prevents LWVTN from fulfilling its primary function of providing voter information because it does not know how to inform its members and the general public accurately and effectively on voting issues related to the upcoming primaries without subjecting them to potential prosecution under Section 115(b). Compl. ¶ 18; Gould Decl. ¶¶ 8, 19–20, 23, 25–26. LWVTN's credibility as a knowledgeable and trusted source for voter information will be upended if this law is allowed to go into effect during the 2024 primary elections, since no information is available for LWVTN to guide voters in determining the meaning of "bona fide," "affiliated," or "allegian[t]" party membership. Gould Decl. ¶ 19.

LWVTN also faces an impossible-to-interpret reporting standard for promulgating "erroneous" information about permissible voting conduct. *See, e.g.*, Tenn. Code. Ann. § 2-2-142 (h) ("Any person or organization who provides or publishes erroneous or incorrect information regarding the qualifications to vote, the requirements to register to vote, whether an individual voter is currently registered to vote or eligible to register to vote, voter registration deadlines, or polling dates, times, and locations shall, upon discovery, immediately notify the appropriate

county election commission and the coordinator of elections."); Compl. ¶ 18; Gould Decl. ¶ 21. Without guidance on the meaning of "bona fide," "affiliated," or "allegian[t]" party member, LWVTN will have no way to determine if it is providing erroneous information regarding the qualifications or requirements to vote, and LWVTN may unintentionally fall out of compliance with this law. Gould Decl. ¶ 21. Thus, Sections 115(b) and (c) prevent LWVTN from carrying out its mission of sharing voter information and encouraging Tennessee voters to participate in crucial primary elections to avoid unwittingly causing voters to engage in criminal misconduct or falling out of compliance with the abovementioned law. *Id.* ¶ 23.

Further, LWVTN is forced to divert significant resources to respond to the implementation, enforcement, and consequences of Sections 115 (b) and (c), including voter education and assistance before the 2024 primary election on March 5, 2024. Gould Decl. ¶ 24. This voter education will be even more difficult because of the unclear meaning of the requirements to vote in a party's primary. *Id.* Upon the passage of Section 115(c), for example, LWVTN began researching how to educate its members and voters about the requirements of Section 115(b). *Id.* ¶ 25. As LWVTN prepares its online voter guide, VOTE411.org, for the presidential primary, it is uncertain what guidance to provide regarding Sections 115(b) and (c). *Id.* ¶ 26. To address this uncertainty, LWVTN is drafting changes to its guidance for its volunteer poll watchers regarding challenges to a voter at the polls by either poll workers or by members of the public who doubt the voter's party affiliation. *Id.* LWVTN also is conferring with other nonpartisan organizations that focus on first-time voters, such as groups registering college students, about best practices to address voter confusion. *Id.* LWVTN will need to budget approximately $3000 to adequately respond to the voter confusion, intimidation, and uncertainty ahead of the 2024 primary election—money the League would otherwise use on voter registration and get-out-the-vote efforts. *Id.* ¶ 29.

9

## II.    Modern Primaries in Tennessee

Primary elections are an increasingly fundamental part of the political process. Compl. ¶ 22. For a registered voter to participate effectively in the selection of candidates for a general election in Tennessee, the registered voter must vote in a political party's primary election. *Id.* The most formidable general election candidates, and the subsequent winners of political elections in Tennessee, are almost always candidates from the dominant political parties in the state: the Republican Party and the Democratic Party. *Id.* ¶ 23. Voting in a political party's primary is essential for a registered voter to have a voice in determining the ultimate candidate for general election and the elected officials who will hold office. *Id.* ¶ 24.

In Tennessee, primary voting is often determinative of general election outcomes. Compl. ¶ 25. The current partisan balance in most of the 95 counties in Tennessee makes selection as a party's candidate a virtual guarantee of victory in the subsequent general election. *Id.* In Knox County, for example, the candidate nominated by the Republican Party was elected in 21 of the last 28 general elections for the Tennessee House of Representatives, as well as in 6 of 6 general elections for the Tennessee Senate. *See* "Election Results" for Knox County, https://www.knoxcounty.org/election/electionresults.php. Likewise, the winning candidate of the Democratic Party nomination overwhelmingly wins the general election in heavily Democratic Shelby and Davidson counties, often without opposition. For example, in 2022, Democrats won 9 of 9 state House seats in Davidson County (with 6 of 9 unopposed). November 8, 2022 Election Results (Certified), https://www.nashville.gov/departments/elections/election-results-and-statistics/election-results/221108. In Shelby County, 10 of 13 state House seats were uncontested (9 won by Democrats, 1 by a Republican). *See* State and Federal General & Bartlett, Collierville, Germantown, Lakeland and Millington municipal - 11.8.2022, https://www.electionsshelbytn.gov/elections/state-and-federal-general-bartlett-collierville-germantown-lakeland-and-millington.

10

Voting in a Tennessee primary is somewhat different from voting in a primary in most other states. While Tennesseans must register to vote as a general matter, they do *not* and *cannot* register as members of a party. Compl. ¶ 26. In other words, a Tennessee voter cannot be a "registered Republican" or a "registered Democrat." *Id.* When the state holds primary elections, a would-be voter must select at the polling place which party's ballot (*i.e.*, Democratic or Republican) they intend to fill out. *Id.* Once a voter has deposited their ballot, the voter's choice of party ballot is marked and maintained as public record. Compl. ¶ 26. Because there are no formal party voter rolls, voters may—and many often do—vote in a different party's primary from one election to the next. *Id.* While Section 115(b) states primary voters must be "bona fide" members or "affiliated with" the party in whose primary they vote, there is nothing in the statute that dictates how such membership may be changed, nor whether such membership must be consistent across all levels of elections, let alone what "bona fide" means.

For instance, it is not uncommon for voters to consider themselves a Republican for national issues and a Democrat on state issues. Compl. ¶ 27. Thus, a given voter, in good faith, may have chosen a Democratic ballot in the State's May 3, 2022, judicial primary and supported the Democratic nominee in the general, and then chosen a Republican ballot in the State's August 4, 2022, congressional primary and supported the Republican nominees in the general. *Id.* There is no mechanism that would stop such a hypothetical voter from this course of conduct (*e.g.*, without a party membership roll, no poll worker would have any basis to deny them a ballot), nor is there a means through which the voter could confirm for themselves whether they would be considered a "bona fide" member of either party for *any* of those primary election votes. Likewise, for a newly registered voter who has just turned 18—and whose intended participation in a primary election may be their first act of political engagement in their lifetime—there is no way whatsoever for the voter to confirm their "bona fides" before selecting a ballot.

11

## III. Statutory Background and History

Section 115(b) provides:

> (b) A registered voter is entitled to vote in a primary election for offices for which the voter is qualified to vote at the polling place where the voter is registered if:
>
> (1) The voter is a bona fide member of and affiliated with the political party in whose primary the voter seeks to vote; or
>
> (2) At the time the voter seeks to vote, the voter declares allegiance to the political party in whose primary the voter seeks to vote and states that the voter intends to affiliate with that party.

Violation of Section 115(b) is punishable under Tennessee Code Annotated §§ 2-19-102 and 2-19-107. Tenn. Code Ann. §§ 2-19-102, 2-19-107. Criminal sanctions are possible when a person "knowingly does any act prohibited by" the voting statutes or "intentionally and knowing that such person is not entitled to . . . vot[es] . . . when such person is not entitled to [vote]." *See* Tenn. Code Ann. §§ 2-19-102, 107.

Section 115 has never been enforced publicly, but Tennessee has recently indicated it is ready to do so. Compl. ¶ 38; Gould Decl. ¶¶ 15–16. In April 2022, Defendant Hargett gave a well-publicized speech declaring his intent to begin enforcing the statute. Compl. ¶ 39. As he put it, "[p]eople need to understand when you go vote in a primary, you are supposed to vote in the primary in which you are a member of the party. . . . The DA could actually prosecute that if people are willingly going in and voting in the other party."[5] *Id.* Two months later, Republicans challenged the outcomes of two elections in Williamson County based on alleged "crossover voting" by

---

[5] *Tennessee Secretary of State, Tre Hargett, speaks at Jackson Rotary Club luncheon*, WNBJ, Apr. 21, 2022, https://www.wnbjtv.com/single-post/tennessee-secretary-of-state-tre-hargett-speaks-at-jackson-rotary-club-luncheon.

specific voters.[6] *Id.* ¶ 40. While the Tennessee Republican Party Executive Committee upheld the results, its members expressed a desire to prevent a repeat and the candidates identified the specific voters who they alleged should not have been allowed to vote. Similar "discord" "over bona fides and crossover voting" arose in connection with at least two other primaries, including a mayoral Republican primary in Hamilton County and a dispute regarding whether a particular candidate for U.S. Congress could appear on the Republican primary ballot.[7] *Id.* ¶ 40.

Moreover, when discussing the issue on the Tennessee House floor, Chairman Rudd claimed that "there are two people currently under indictment . . . for organizing crossing over into the other party's primary . . . ." H.B. 0828, 113th Gen. Assemb. 27th Sess. (Tenn. 2023); Compl. ¶ 41. While Plaintiffs have been unable to identify these two alleged prosecutions, this claim nonetheless demonstrates an increasing desire to prosecute under Section 115(b).

In May 2023—in connection with a growing movement to deter crossover primary voters—the Legislature enacted Section 115(c). Compl. ¶ 34. Subsection (c) literally confronts voters with a sign that warns them of prosecution under Section 115(b). Subsection (c) provides:

> On primary election days, a sign that is a minimum of eight and one-half inches by eleven inches (8.5"x11") with a yellow background and bold, black text containing the following language must be posted in each polling place:
>
> **It's the Law! Please Read...**
>
> **It is a violation of Tennessee Code Annotated, Section 2-7-115(b), and punishable as a crime under Tennessee Code Annotated, Section 2-19-102 or Section 2-19-107, if a person votes in a political party's primary without being a bona fide member of or affiliated with that political party, or to declare allegiance to that party without the intent to affiliate with that party.**

---

[6] J. Holly McCall, *Tennessee Republican Party Upholds Williamson County Primary Results*, Tennessee Outlook, Jun. 10, 2022, https://tennesseelookout.com/briefs/tennessee-republican-party-upholds-williamson-county-primary-results/.

[7] *Id.*

> (2) The officer of elections at each polling place shall ensure that the sign prescribed by subdivision (c)(1) is posted in a prominent, highly visible location within the polling place.

Tenn. Code Ann. § 2-7-115(c) (emphasis in original); Compl. ¶ 35 (quoting *id.*).

During debate on subsection (c) as part of H.B. 0828 and S.B. 0978, the bill's sponsor confirmed it is "up for conjecture" whether someone could be prosecuted if they vote in a Republican primary after having historically voted for Democrats. H.B. 0828, 113th Gen. Assemb. 27th Sess. (Tenn. 2023); Compl. ¶ 42. This statement highlights the inherent vagueness of the bill.

## STANDARD OF REVIEW

Preliminary injunctions are considered preventive, prohibitory, or protective measures taken pending resolution on the merits of the case. *See Clemons v. Board of Educ. of Hillsboro, Ohio*, 228 F.2d 853, 856 (6th Cir. 1956). Four factors guide this Court's consideration of whether to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 385 (6th Cir. 2020) (quoting *Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015)); *see also Nat'l Viatical, Inc. v. Universal Settlements, Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013).

"These factors are not prerequisites, but are factors that are to be balanced against each other." *Id.*; *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *see also Six Clinic Holding Corp., II v. Cafcomp Systems*, 119 F.3d 393, 400 (6th Cir. 1997). That said, a strong showing on the other factors does not eliminate the irreparable harm requirement. *See D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326-27 (6th Cir. 2019); *Patio Enclosures, Inc. v.*

*Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) ("The demonstration of some irreparable injury is *sine qua non* for issuance of an injunction."). Additionally, "[a] finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzalez v. Nat'l Bd. of Medical Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

## ARGUMENT

**I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

**A.      Plaintiffs Are Likely to Establish that Sections 115(b) and (c) Are Void for Vagueness.**

Plaintiffs are likely to succeed on the merits of their claim that Sections 115(b) and (c) are unconstitutionally vague in violation of the Fourteenth Amendment's guarantee of due process. Statutes are void for vagueness when they (1) "fail[] to give ordinary people fair notice" of what conduct is prohibited, or (2) are "so standardless that [they] invite[] arbitrary enforcement" from authorities who lack direction. *Johnson*, 576 U.S. at 595; *see also Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (noting that the second element of the doctrine is most significant); *Miller v. City of Cincinnati*, 622 F.3d 524, 539 (6th Cir. 2010) ("The void-for-vagueness doctrine not only ensures that laws provide 'fair warning' of proscribed conduct, but it also protects citizens against the impermissible delegation of basic policy matters 'for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'" (citation omitted)); *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 556 (6th Cir. 1999).

Furthermore, where a law "threatens to inhibit the exercise of constitutionally protected rights," courts must apply a "more stringent vagueness test"—*i.e.*, heightened scrutiny applies. *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982). Here, the application of heightened scrutiny could not be clearer: the statute at issue threatens criminal penalties for voting conduct, which is at the core of the Constitution's protections. *See League of Women Voters of*

15

*Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008) ("The right to vote is a fundamental right, 'preservative of all rights.'" (citations omitted)); *Memphis A. Phillip Randolph Inst. v. Hargett*, 482 F. Supp. 3d 673, 687 (M.D. Tenn.), *aff'd on other grounds,* 978 F.3d 378 (6th Cir. 2020) ("The Court well understands that the constitutional right to vote is 'fundamental.'"). Under any standard, Section 115(b) fails *both* prongs of the void-for-vagueness test and is therefore unconstitutional.

### 1. The statute fails to provide fair or accurate notice to citizens of what conduct is prohibited.

Sections 115(b) and (c) do not provide citizens with fair or adequate notice of what conduct it prohibits. Subsection (b) limits voting in primaries to (1) "bona fide" members of a party who are *also* "affiliated" with that party, or (2) voters who "declare allegiance" to a political party at the time of the primary and "intend[] to affiliate with that party." While a defect in *any* of these terms would render the statute unconstitutional, here, *none* of these terms passes constitutional muster as a prerequisite for imposing criminal penalties.

The Tennessee Code does not define what it means to be a "bona fide member" of a party. Compl. ¶¶ 47, 49. Common usage also fails to offer clear guidance of what is prohibited, as the term "bona fide" is inherently subjective: its definitions in Black's Law Dictionary (both today and in the operative version when the statute was enacted, in 1972), for instance, all depend on subjective intent. *See Bona Fide*, Black's Law Dictionary (11th ed. 2019) ("1. Made in good faith; without fraud or deceit. 2. Sincere; genuine."); *see also Bona Fide*, Black's Law Dictionary (4th ed. 1968) ("Is or with good faith; honestly, openly, and sincerely; without deceit or fraud. . . .Truly; actually; without simulation or pretense. Innocently; in the attitude of trust and confidence; without notice of fraud, etc. Real, actual, genuine, and not feigned."). What it means to be genuinely or sincerely or innocently a member of a political party is wholly unclear.

16

The same goes for "affiliat[ion]" and "declar[ing] allegiance"—concepts undefined in the Tennessee Code and subject to contradictory definitions in common usage. *See Affiliate*, Black's Law Dictionary (4th ed. 1968) ("Signifies a condition of being united, being in close connection, allied, or attached as a member or branch."); *Affiliate*, Oxford English Dictionary ("To be connected with a larger or more established organization, as a branch or subsidiary part; to adhere or belong to an organization or group; to be a member or affiliate of a certain body. Also more generally: to be a part of something."); *Allegiance*, Black's Law Dictionary (11th ed. 2019) ("A citizen's or subject's obligation of fidelity and obedience to the government or sovereign in return for the benefits of the protection of the state. Allegiance may be *either* an absolute and permanent obligation *or* a qualified and temporary one." (emphasis added)); *Allegiance*, Black's Law Dictionary (4th ed. 1968) ("Obligation of fidelity and obedience to government in consideration for protection that government gives."); Compl. ¶¶ 48–49. And Tennessee does not have a system to implement these terms via formal voter registration with a given party. *See id.* ¶¶ 52, 55.

Not only does the statute fail to define what is prohibited, it effectively delegates the definition of unlawful conduct to private entities—the political parties themselves. Compl. ¶ 51. Such delegation is neither lawful nor functional. It is not lawful because it is an "impermissible delegation of [criminal liability] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application" by political parties. *Miller*, 622 F.3d at 539.

And even if such delegation were permissible, the political parties have no functional definition, either. Compl. ¶ 52. The Republican Party's bylaws *do not define* a bona fide member for the purpose of voting in a primary *at all*. *See* Bylaws and Rules of the Tennessee Republican Party, Article IX Section 1 (defining a "bona fide" member for purposes of party membership for candidacy for public office, but failing to provide any definition of "bona fide" member for the

17

purpose of voting in a primary); Compl. ¶ 52.[8] The Democratic Party's Bylaws at least offer a definition, but it, too, is vague and entirely subjective. *See* Bylaws of the Tennessee Democratic Party, Article IV, Section 1 (defining a bona fide member as "an individual whose record of public service, actions, accomplishment, public writings and/or public statements affirmatively demonstrates that they are faithful to the interests, welfare and success of the Democratic Party of the United States and of the State of Tennessee"); *Id.* ¶ 52. The parties also fail to define "affiliation" or "allegiance," let alone how long such allegiance is owed.[9] And, as the Tennessee Supreme Court clarified last year, a party's ultimate determination of what *any* of these terms mean can be determined by the party executive committee in secret, without notice, and without any material limitation on how or why the party may decide to rescind the requisite "bona fides" from any person or group. *See Newsom v. Tenn. Republican Party*, 647 S.W.3d 382, 387 (Tenn. 2022).

Consequently, these terms fall below the constitutional threshold for specificity. *See Miller*, 622 F.3d 524, 539-40 (the phrase "to exercise the rights and responsibilities specified in the Charter of the City . . . ," provided "no meaningful guidance"); *United Food & Comm. Workers Union Union v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 359–60 (6th Cir. 1998) (holding the terms *controversial* and *aesthetically pleasing* void for vagueness); *Dambrot v. Cent. Mich. Univ.*, 55

---

[8] Compounding the problems of failing to define a "bona fide" *voter*, the Republican Party Bylaws *do* define what it means to be a "bona fide" *candidate*, but in ways that are untenable as applied to voting. Tenn. Code Ann. § 2-13-104 (in the context of candidates for a party's ballot, "a party may require by rule that candidates for its nominations be bona fide members of the party"); *Newsom v. Tenn. Republican Party*, 647 S.W.3d 382, 387 (Tenn. 2022) ("[A] party's state executive committee makes the determination of whether a candidate is a bona fide member of the party"). For example, a bona fide *candidate* must attend party meetings, serve as a member of an auxiliary, work on a campaign, or have contributed financially to the party—criteria that most Tennesseans who consider themselves Republican and have always voted Republican would not meet.

[9] For instance, an "allegiance" requirement could be read to suggest that a voter must be loyal to the party for a lifetime to vote in the primary without fear or criminal prosecution, or, alternatively, could be read to mean that a simple verbal affirmation to a poll worker or party member could suffice. The statute is silent as to which (if either) of these meanings are at play.

18

F.3d 1177, 1184 (6th Cir. 1995) (holding the term *offensive* void for vagueness because "[t]hough some statements might be seen as universally offensive, different people find different things offensive"). And, even if "[e]ach of the uncertainties in the [statute were] tolerable in isolation … their sum makes a task for us which at best could be only guesswork." *Johnson*, 576 U.S. at 602 (citation omitted). "Invoking so shapeless a provision to condemn someone to prison . . . does not comport with the Constitution's guarantee of due process." *Id.* These uncertainties render the statute too vague to provide adequate notice to Mr. Ashe and Mr. Lawson, LWVTN and its members, and other similarly situated voters.

Not only does the statute fail to give constitutionally adequate notice of prohibited conduct, Section 115(c) in fact requires *false notice* by mandating that polling locations post signs that patently misstate the law in Section 115(b). Section 115(c) requires a *disjunctive warning* that voters must be *either* a bona fide member of a party *or* affiliated with the same to vote in a primary. But Section 115(b) requires *conjunctively* that a voter must be *both* "a bona fide member of *and* affiliated with the political party*" to be eligible. (emphasis added). False notice cannot be fair notice, particularly where the misstatement is likely to induce *more* voters into violating Section 115(b) (*i.e.*, because they are "affiliated" with a party but are not also bona fide members).[10] This syntactical contradiction demonstrates not only that criminal liability is being threatened based on standardless criteria, but that the State is not even being consistent about when criminal liability attaches. That is the essence of a due process violation. An ordinary person cannot know from the plain text of Sections 115(b) and (c) whether the broader or narrower version of criminal liability applies and that is reason alone to enjoin its enforcement.

---

[10] Compl. ¶ 74; *accord Hargett*, 420 F. Supp. 3d at 705, 708 ("As a practical matter, this requirement merely send[s] . . . an intimidating message about the possibility of prosecution" (quotation marks omitted)).

19

### 2. The statute lacks clear guidance to law enforcement.

The statute also fails the second prong of the vagueness inquiry in that it does not provide clear guidelines to govern its enforcement, allowing for impermissibly broad discretion and discrimination by the party, the prosecutor, or both. *United Food*, 163 F.3d at 359 ("The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors."). This problem is exacerbated by the retrospective nature of enforcement. Consider again an 18-year-old Tennessean casting her first vote. When she walks into the polling place, neither she nor any poll worker would be able to confirm her "bona fides" for either party. *See* Compl. ¶ 55. *After* the election, though, because her ballot selection becomes public, she could be deemed *not* to have been a bona fide member when she voted based on her social media posts, club affiliations, family members, or anything else, and then prosecuted. *Id.* ¶¶ 55–56; *cf. Hargett*, 420 F. Supp. 3d at 706 ("Without some clarity about the type of payment contemplated by the Act, it is impossible for a person or organization to know if it is covered.").

The post hoc nature of enforcement also gives free license to ambitious district attorneys to bring criminal charges against their political opponents or prominent party dissenters. Compl. ¶ 57. For example, a Trump-supporting district attorney might bring criminal charges against a "never Trump" Republican—such as Mr. Ashe who has publicly criticized former President Trump, Ashe Decl. ¶¶ 8-9. Or a progressive district attorney might bring charges against a person voting in the Democratic primary who has not always supported the Democratic nominee—such as Mr. Lawson, who has publicly-supported conservative Republicans in general elections, Lawson Decl. ¶ 8. A poll watcher, likewise, could easily make assumptions on appearance and claim the voter violated Section 115(b) by voting in a partisan primary that does not fit their appearance. A standard that gives officials this much leeway in bringing charges is not

20

constitutional. *See City of Chicago v. Morales*, 527 U.S. 41, 61 (1999) (striking down ordinance where it effectively gave officers sweeping authority to determine what behavior constituted loitering); *accord Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) ("[I]f the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, [it would] substitute the judicial for the legislative department.").

### B. Plaintaiffs Are Likely to Succeed on Their First Amendment Claim.

Plaintiffs are likely to succeed on the merits of their claim that Sections 115(b) and 115(c) deter voting and other protected expression in violation of the First Amendment's speech clause. The First Amendment's "overbreadth doctrine" permits "an individual whose own speech or conduct may be prohibited" to "challenge a statute on its face 'because it threatens [the free speech rights of] others.'" *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 574 (1987); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985). The doctrine is especially apt where, as here, the statute threatens criminal sanctions. *See Hicks*, 539 U.S. at 119 (overbreadth doctrine responds to "threat [that] enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions."). "Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Id.* (citation omitted). Thus, "[f]acial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Sec'y of State of Md. v. Munson Co., Inc.*, 467 U.S. 947, 958 (1984).

Because the First Amendment overbreadth doctrine is "strong medicine," *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973), it facially invalidates a statute only (1) when its overbreadth is "substantial" in "relation to the statute's plainly legitimate sweep," and (2) where the law is not readily susceptible to a limiting construction. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008); *Broadrick*, 413 U.S. at 613, 615. This understanding derives from the doctrine's purpose. "While a sweeping statute, or one incapable of limitation, has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation." *New York v. Ferber*, 458 U.S. 747, 772 (1982). In applying this framework, the Court may consider how much the law "delegates overly broad discretion to the decisionmaker." *Forsyth Cnty, Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992); Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 884 (1991) (overbroad laws raise "a concern . . . that the legislature . . . has created an excessively capacious cloak of administrative or prosecutorial discretion, under which discriminatory enforcement may be hidden.").

Here, Sections 115(b) and (c) violate the First Amendment overbreadth doctrine. The first step in that analysis is "to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). The Court must "ascertain whether the enactment reaches a substantial amount of constitutionally protected conduct." *Boos v. Barry*, 485 U.S. 312, 329 (1988). "The [government's] authoritative constructions of the [law], including its own implementation and interpretation of it" are pertinent in gauging the scope of a challenged speech restriction. *Forsyth Cnty*, 505 U.S. at 131; *see Mansky*, 138 S. Ct. at 1889.

Here, by combining a threatening sign with an impossibly vague law, Section 115 penalizes or deters an extraordinary range of protected voting conduct. *E.g.*, Compl. ¶¶ 69–72. Eighteen-

year-olds who have never voted before might turn away from the polls for fear of lacking the requisite bona fides. Those who intend to switch parties or engage in national-state ticket-splitting might do the same for fear of having their allegiance questioned. Poll workers or poll watchers—who have zero guidance about how to interpret the law displayed on the mandated signs—might question would-be voters about their bona fides before handing them a ballot (or refusing to do so), leading to irresolvable voting-day disputes and lengthy lines.

In addition to the *direct* voting behavior that the statute deters, it could also chill political expression generally. As the Supreme Court explained in *Mansky*, 138 S. Ct. at 1891, in today's hyper-partisan environment, observers may make partisan assumptions about apparel or bumper stickers dealing with Black Lives Matter, Blue Lives Matter, the NRA, a rainbow flag, an American flag, a Ukrainian flag, a Star of David, the Second Amendment, the ACLU, Fox News, climate change, the AARP, the World Wildlife Fund, or even Ben & Jerry's Ice Cream. Voters may be less likely to engage in non-conforming or idiosyncratic political expression if it might call their bona fides into question and threaten their ability to participate in the primary.

Having described the statute's extraordinary reach, the second step turns on the strength of the government's interest in enforcing the statute. Because a polling place is a nonpublic forum, Sections 115(b) and (c) survive a First Amendment challenge only if there is a "sensible basis for distinguishing" prohibited conduct from permitted conduct. *Mansky*, 138 S. Ct. at 1888. Here, the "unmoored use of the term[s] [bona fide, allegiance, and affiliate], combined with haphazard interpretations [and lack of] official guidance [from the State], cause [these] restriction[s] to fail." *Id.*; *see also id.* at 1886 ("The question accordingly is whether [the challenged law] is 'reasonable in light of the purpose served by the forum': voting." (citation omitted)). In short, there is "no conceivable governmental interest" that supports the criminalization of voting conduct based on the unwritten whims of poll workers, state party leadership, or local prosecutors. *Jews for Jesus*,

482 U.S. at 576 (a resolution banning all "First Amendment activities" in an airport could not be saved by a "murky" construction excluding "airport-related" activity).

Tennessee may claim its interest in orderly elections justifies a crackdown on alleged mischievous crossover primary voting. But here, history works against the state—the reality that no prosecutions have ever been sought under Section 115(b) belies any suggestion that crossover voting is such a menace that criminal liability and stark deterrent warnings are justified. Gould Decl. ¶ 15 (attesting that Section 115(b) has never been enforced publicly, and most voters are unaware of its requirements); *accord Hargett*, 420 F. Supp. 3d at 708 (finding no compelling state interest in policing an election-related problem without "evidence that such situations are likely or common. In order . . . to pass constitutional muster, it must remedy a harm that is, at the very least, potentially real, not purely hypothetical." (cleaned up)); *Grossman v. City of Portland*, 33 F.3d 1200, 1209 n.19 (9th Cir. 1994) (noting that an official cannot assume that "ordinance which has fallen into desuetude" "continues to be consistent with the current state of constitutional law").

Furthermore, even if crossover voting were a problem, the statute's vagueness makes it impossible for a court to apply and enforce its prohibitions in a way that would address that problem. *See Mansky*, 138 S. Ct. at 1889-90 ("A rule whose fair enforcement requires an election judge to maintain a mental index of the platforms and positions of every candidate and party on the ballot is not reasonable. Candidates for statewide and federal office and major political parties can be expected to take positions on a wide array of subjects of local and national import."); Compl. ¶ 75. For instance, judges would be forced to evaluate a given voter's bona fides based on a virtually unbounded and ever-changing set of partisan preferences.

24

## II. A Preliminary Injunction Is Necessary.

### A. Plaintiffs Will Suffer Immediate and Irreparable Harm If Sections 115(b) and 115(c) Remain in Effect.

If Sections 115(b) and 115(c) remain in effect, Plaintiffs will suffer severe and irreparable harm for which no adequate remedy at law exists. *See Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 708 (N.D. Ohio 2006) ("But for the issuance of an injunction, Plaintiffs will continue to be dissuaded from engaging in an important political activity," and an injunction is therefore necessary."). The violation of Plaintiffs' constitutional rights is irreparable harm. *Obama for Am.*, 697 F.3d at 436 ("A restriction on the fundamental right to vote … constitutes irreparable injury"); *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998) ("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) (similar).

"The nature of elections . . . is that time is of the essence. It is not uncommon in Tennessee for the voters . . . to have multiple opportunities to go to the polls in a year, between primaries, general elections, runoffs, and special elections. But when each chance is gone, it is gone." *Hargett*, 420 F. Supp. 3d at 711. "Forcing the plaintiffs to wait while a case winds its way through litigation would mean taking away chances to participate in democracy that will never come back." *Id.* There is therefore a strong likelihood of irreparable injury if this statute is allowed to stand.

### B. The Balance of Equities Weighs in Plaintiffs' Favor and Issuance of the Preliminary Injunction Is in the Public Interest.

The balance of equities weighs heavily in favor of Plaintiffs. The harms to Plaintiffs, including exclusion from exercising their fundamental right to vote, subjecting them to criminal prosecution based on impossibly vague language that they cannot decipher, and preventing them

25

from carrying out their organizational mission greatly outweigh any potential harms that Defendants may face if injunctive relief is granted. *E.g.*, Compl. ¶¶ 81–86, 92–93; Ashe Decl. ¶ 10; Lawson Decl. ¶ 9; Gould Decl. ¶¶ 13–28. Specifically, Mr. Ashe and Mr. Lawson are not certain that they can vote in the primary election without fear of prosecution for violating Section 115(b), and LWVTN's members could be deterred from voting in the primary election for the same reason. Ashe Decl. ¶ 10; Lawson Decl. ¶ 9; Gould Decl. ¶¶ 12–14. As discussed above, LWVTN's credibility as a knowledgeable and trusted source for voter information will be upended because there is no way for LWVTN to accurately and effectively inform voters on issues related to the upcoming primaries without potentially subjecting them to enforcement of Section 115(b). Gould Decl. ¶ 19. Further, LWTVN will not be able to determine if it is providing erroneous information regarding the qualifications or requirements to vote, and may unintentionally fall out of compliance with Tennessee Election Law Section 2-2-142(h), which requires a person or organization to immediately report if it "provides or publishes erroneous or incorrect information regarding the qualifications to vote." *Id.* ¶ 21. And LWTVN has been forced to divert significant resources to educate the public about the law and its consequences before the 2024 primary election on March 5, 2024. *Id.* ¶¶ 24–27. It will need to budget approximately $3000 to adequately respond to the voter confusion, intimidation, and uncertainty created by these laws—money the League would otherwise use on voter registration and get-out-the-vote efforts. *Id.* ¶ 29.

Defendants' sole harm would be to *not* enforce Sections 115(b) and (c), but this statute does not reasonably advance a state interest that counterbalances the infringement of Plaintiffs' constitutional rights. *See Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *FemHealth USA, Inc. v. City of Mt. Juliet*, 458 F. Supp. 3d 777, 805 (M.D. Tenn. 2020). Moreover, though injunctive relief is needed quickly, there is still adequate time for the court to grant this injunction, as Tennessee will not conduct its next state and federal primary election until

26

March of 2024 and the elimination of these unconstitutional provisions will not significantly impact the mechanics of the election. Section 115(b) has never been enforced, and Section 115(c) requires a sign that before the enactment of Section 115(c) had never been placed at polling places before. Granting the injunction will simply maintain the status quo as it has always existed in Tennessee.

Granting an injunction in this case will serve the public interest. As the Sixth Circuit has made clear, "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Miller*, 622 F.3d at 540 (citations omitted); *see also Am. C.L. Union Fund of Michigan v. Livingston Cnty.*, 796 F.3d 636 (6th Cir. 2015). It is further in the public's interest to enforce the protections against intimidation Congress placed in Section 11(b) of the Voting Rights Act. The current voter participation rate in Tennessee places it in the bottom ten percent of all states in the nation. Gould Decl. ¶ 30. Thus, granting the preliminary injunction here would serve the public interest in its highest regard by protecting the due process and voting rights of Plaintiffs and all Tennessee voters.

### C.     A Statewide Injunction Is Necessary.

"[T]he scope of injunctive relief is dictated by the extent of the violation established," which here is statewide. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). An injunction for just the named Plaintiffs is insufficient because Tennessee voters are unable to participate in primary elections without fear of prosecution and there is no alternative means to secure the fundamental right to vote as long as Sections 115(b) and 115(c) stand.

While states have "a strong interest in their ability to enforce state election law requirements," *Hunter v. Hamilton County Board of Elections*, 635 F.3d 219, 244 (6th Cir. 2011),

the public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez,* 549 U.S. 1, 4, 127 S. Ct. 5, 166 L. Ed. 2d 1 (2006) (internal citations omitted). "That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Hunter,* 635 F.3d at 244. Likewise, the public has a strong interest in not being subject to impossibly vague laws, especially in the criminal context, and even more when that impossibly vague criminal sanction works to intimidate a person from exercising the right to vote. *See, e.g.*, *Flipside*, 455 U.S. at 499 (a more stringent vagueness test applies when constitutional rights are implicated); *accord Fish v. Kobach*, 840 F.3d 710, 755-56 (10th Cir. 2016) (upholding injunction based on "public interest in broad exercise of the right to vote"). The public interest therefore favors permitting as many qualified voters to vote as possible, including through the prevention of voter suppression resulting from Sections 115(b) and 115(c).

Statewide facial relief is necessary to protect Tennessee voters from irreparable harm. Thus, the preliminary injunction should apply to all Tennessee voters.

## CONCLUSION

For all these reasons, Plaintiffs' Motion for Preliminary Injunction should be granted.

Dated: December 8, 2023                    Respectfully submitted,

/s/ *R. Culver Schmid*
R. Culver Schmid, BPR No. 011128
Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC
265 Brookview Centre Way, Suite 600
Knoxville, TN 37919
Tel.: (865) 971-5103
cschmid@bakerdonelson.com

Gary Shockley, BPR No. 010104
Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN 37203
Tel.: (615) 726-5600
gshockley@bakerdonelson.com

Eric G. Osborne, BPR No. 029719
Christopher C. Sabis, BPR No. 030032
William L. Harbison, BPR No. 007012
Frances W. Perkins, BPR No. 040534
Sherrard Roe Voigt & Harbison, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Tel.: (615) 742-4200
eosborne@srvhlaw.com
csabis@srvhlaw.com
bharbison@srvhlaw.com
fperkins@srvhlaw.com

*Counsel for Plaintiffs Victor Ashe and Phil Lawson*

John E. Haubenreich, BPR No. 029202
The Protect Democracy Project
2020 Pennsylvania Avenue NW, #163
Washington, DC 20006
Tel.: (202) 579-4582
john.haubenreich@protectdemocracy.org

Orion Danjuma (*pro hac vice* pending)
The Protect Democracy Project
82 Nassau St. #601
New York, NY 10038
Tel.: (202) 579-4582
orion.danjuma@protectdemocracy.org

Collin P. Wedel (*pro hac vice* pending)
Sidley Austin LLP
555 W. Fifth St., Suite 4000
Los Angeles, CA 90013
Tel.: (213) 896-6000
cwedel@sidley.com

Jillian Sheridan Stonecipher (*pro hac vice*
pending)
Rebecca B. Shafer (*pro hac vice* pending)
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Tel.: (312) 853-7000
jstonecipher@sidley.com
rshafer@sidley.com

*Counsel for Plaintiff League of Women Voters of Tennessee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 8, 2023 a true and exact copy of the foregoing is being served via the Court's CM/ECF system and email upon the following:

Zachary L. Barker
Assistant Attorney General
Public Interest Division
P.O. Box 20207
Nashville, Tennessee 37202
Zachary.Barker@ag.tn.gov

Dawn Jordan
Special Counsel
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
Dawn.Jordan@ag.tn.gov

*/s/ Eric G. Osborne*_____
Eric G. Osborne