IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

VICTOR ASHE, et al.,                    )
                                        )
        Plaintiffs,                     )        NO. 3:23-cv-01256
                                        )
v.                                      )        JUDGE RICHARDSON
                                        )
TRE HARGETT, et al.,                    )
                                        )
        Defendants.                     )

## **MEMORANDUM OPINION**

Plaintiffs brought this action against Defendants[1] challenging the constitutionality of both Tenn. Code Ann. § 2-7-115(b) ("Section 115(b)") and Tenn. Code Ann. § 2-7-115(c) ("Section 115(c)") (collectively, "Sections 115(b) and (c)"). Specifically, Plaintiffs allege that Section 115(b) is unconstitutionally vague in violation of Plaintiffs' right to due process of law under the Fourteenth Amendment to the United States Constitution, and that Sections 115(b) and (c) both deter voting and chill their freedom of political speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs seek declaratory and injunctive relief prohibiting Defendants from enforcing Sections 115(b) and (c).

Pending before the Court is the motion (Doc. No. 31, "Motion") filed by Tre Hargett, Tennessee Secretary of State ("Hargett"), Mark Goins, Tennessee Coordinator of Elections ("Goins"), and Jonathan Skrmetti, Tennessee Attorney General ("Skrmetti") (collectively "Defendants") to dismiss the claims against it set forth in the Complaint (Doc. No. 1) filed by Victor Ashe ("Ashe"), Phil Lawson ("Lawson"), and the League of Women Voters of Tennessee ("the League") (collectively, "Plaintiffs"). Defendants filed a memorandum (Doc. No. 32,

---

[1] Defendants are sued in their official capacities only. (Doc. No. 1 at ¶¶ 19–21.)

"Memo") in support of the Motion. Plaintiffs filed a response (Doc. No. 34, "Response") in opposition, to which Defendants filed a reply (Doc. No. 36, "Reply").

For the reasons stated herein, the Motion (Doc. No. 31) will be granted.

FACTUTAL ALLEGATIONS[2]

Ashe and Lawson are residents of, and voters registered in, Knox County, Tennessee. (*Id*. at ¶¶ 15–16.) The League is a non-profit, non-partisan political organization whose mission is to empower voters and defend democracy. (*Id*. at ¶ 17). The League accomplishes this mission in part by helping Tennessee citizens register to vote, educating voters about the issues, and encouraging voters to be active participants in democracy by engaging with elected officials and their policy decisions. (*Id*. at ¶ 17).

While as a general matter Tennesseans must register to vote in order to vote, they do not and cannot register as members of any party. (*Id*. at ¶ 26). Instead, when the state holds primary elections, a would-be voter who otherwise is eligible to vote must select at the polling place which party's ballot (e.g., Democratic or Republican) he or she intends to fill out. (*Id*.). In a given primary, no voter may fill out a ballot for more than one party. (*Id*.). Once a voter has made his or her selections and deposited his or her ballot, the voter's choice of party ballot is marked and maintained as public record. (*Id*.). Since there are no formal party voter rolls, voters may (and often do) switch to vote in a different party's primary from one election to the next. (*Id*.).

---

[2] The facts herein are taken from the Complaint (Doc. No. 1). Because the Court construes the Motion as a facial attack on standing, the facts in the Complaint are accepted as true purposes of the instant Motion, except to the extent that they are qualified herein (as for example by "Plaintiffs allege") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

Ostensibly to deter voting by supporters of one political party in the primary election of another political party (i.e., "cross-over voting"), the Tennessee State Legislature passed Sections 115(b) and (c) Section 115(b). Section 115(b), signed into law in 1972, requires that a person seeking to vote in a particular party's primary election be a "bona fide member of and affiliated with" that party or "declare[ ] allegiance" to that party at the time the voter seeks to vote.[3] (*Id*. at ¶¶ 22, 28–30). Failure to do so may result in criminal prosecution. (*Id*. at ¶ 30). Section 115(c), enacted in May 2023, requires that the officer of elections at each polling place post prominent notices to warn voters that they will be subject to prosecution if they vote in the primary of a particular party but neither are a "bona fide member of or affiliated with that political party" nor "declare allegiance to that party" (i.e., if they do not comply with either of the alternative requirements of Section 115(b) for voting on that party's primary). (*Id*. at ¶¶ 34–35).

The relevant portion of Section 115(c) states:

> (1) On primary election days, a sign that is a minimum of eight and one-half inches by eleven inches (8.5″x11″) with a yellow background and bold, black text containing the following language must be posted in each polling place:
>
> > **It's the Law! Please Read... It is a violation of Tennessee Code Annotated, Section 2-7-115(b), and punishable as a crime under Tennessee Code Annotated, Section 2-19-102 or Section 2-19-107, if a person votes in a political party's primary without being a bona fide member of or affiliated with that political party, or**

---

[3] Specifically, Section 115(b) states, in relevant part:

A registered voter is entitled to vote in a primary election for offices for which the voter is qualified to vote at the polling place where the voter is registered if:

> (1) The voter is a bona fide member of and affiliated with the political party in whose primary the voter seeks to vote; or
>
> (2) At the time the voter seeks to vote, the voter declares allegiance to the political party in whose primary the voter seeks to vote and states that the voter intends to affiliate with that party.

Tenn. Code Ann. § 2-7-115(b).

> **to declare allegiance to that party without the intent to affiliate with that party.**
>
> (2) The officer of elections at each polling place shall ensure that the sign prescribed by subdivision (c)(1) is posted in a prominent, highly visible location within the polling place.

Tenn. Code Ann. § 2-7-115(c). (Doc. No. 32 at 2.).

As noted in Section 115(c), violation of Section 115(b) is punishable as a crime under Tenn. Code Ann. §§ 2-19-102 and 2-19-107. (Doc. No. 1 at ¶ 35). Section 2-19-107 makes it a felony, for a person who knows that he or she is not entitled to register or vote under Title 2, to register or vote (or attempt to do so) intentionally.[4] (*Id.* at ¶ 32). Thus, a violation of Section 115(b) amounts to a felony only if the violator intentionally registers or votes (or attempt to do so) despite knowing that he or she is not entitled to register or vote under Section 115(b).[5] (*Id.*). Section 2-19-102, by contrast, makes it a misdemeanor for a person either to knowingly do any act that is prohibited by Title 2 of the Tenn. Code Ann. (which includes Section 115(b)) or to knowingly fail to do any act that he or she is required to do by Title 2 (including, as noted, Section 115(b)).[6] (*Id.* at ¶¶ 31–32).

Despite the fact that there have been no known prosecutions under Section 115(b) in the roughly 50 years since it became law, Plaintiffs allege that Defendants, along with other state

---

[4] In paragraph 32 of the Complaint, Plaintiffs mistakenly cite to "Section 2-19-207." However, the rest of the Complaint makes clear they intended to refer to "Section 2-19-107."

[5] As relevant here, for purposes of Section 115(b), a person knows that (s)he is not entitled to register or vote if (s)he knows that (s)he is not a bona fide member of or affiliated with the party in whose primary (s)he wishes to vote, and know that (s)he did not declare allegiance to that party at the time of voting.

[6] Section 2-19-102 prescribes a broader scope of liability in that it applies to every statute under Title 2 of the Tenn. Code Ann., whereas § 2-19-107 prescribes a narrower scope of liability in that applies only to illegal registration of voting or illegal voting (including, of course, violations of Section 115(b)).

officials, have recently indicated their intent to begin enforcing it via prosecution.[7] (Doc. No. 1 at ¶¶ 39–42). Moreover, Plaintiffs claim that because no statutory definitions are provided for the terms "bona fide member of," "affiliated with," or "allegiance to" a political party, Sections 115(b) and (c) are void for vagueness under the Fourteenth Amendment. (*Id*. at ¶¶ 78–83). Plaintiffs further claim that "[b]y combining a prominently threatening sign with an impossibly vague law," Sections 115(b) and (c) violate their rights under the First Amendment "to engage in the political process and to exercise their fundamental right to vote." (*Id*. at ¶¶ 92–95).

Plaintiffs seek a declaration from this Court that Sections 115(b) and (c) are (i) void for vagueness under the Fourteenth Amendment, and (ii) overbroad in violation of the Free Speech Clause of the First Amendment's. (*Id*. at 19). Additionally, Plaintiffs seek an injunction[8] prohibiting Defendants from enforcing Sections 115(b) and (c).

Via the instant Motion, Defendants seek dismissal of this action pursuant to Fed. R. Civ. P. 12(b)(1) and (6) on grounds that Plaintiffs lack standing to sue and that Plaintiffs' claims are barred by sovereign immunity, laches, and the applicable statute of limitations. (Doc. No. 32 at 1). For the reasons stated below, the Court concludes that it is devoid of subject-matter jurisdiction because Plaintiffs lack standing to sue. This conclusion pretermits the Court's consideration of any other aspects of this case. Accordingly, the Court will decline to consider Defendants' other

---

[7] In support of this allegation, Plaintiffs point to a speech made by Defendant Hargett in April 2022 in which he stated "[p]eople need to understand when you go vote in a primary, you are supposed to vote in the primary in which you are a member of the party. . . . The DA [district attorney general] could actually prosecute that if people are willingly going in and voting in the other party." (*Id*. at ¶ 39). Plaintiffs point also to the enactment of Section 115(c) as well as recent challenges by Republicans to the outcomes of county elections based on alleged "crossover voting." (*Id*. at ¶ 40). Finally, Plaintiffs point to a statement made by Chairman Rudd on the Tennessee House Floor, that "there are two people currently under indictment . . . for organizing crossing over into the other party's primary . . . ." (*Id*. at ¶ 41). According to Plaintiffs, all of this demonstrates an increased (and increasing) desire by the State to enforce Section 115(b).

[8] Plaintiffs seek both preliminary and permanent injunctive relief. Plaintiffs filed a motion for a preliminary injunction (Doc. No. 21, "Motion for Preliminary Injunction") on December 8, 2023.

arguments in favor of dismissal, including arguments that the Court lacks subject-matter jurisdiction for additional reasons and that Plaintiffs have failed to state a claim upon which relief may be granted.

<u>LEGAL STANDARD</u>

Rule 12(b)(1) "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "Subject matter jurisdiction is always a threshold determination." *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). "As always, the party invoking federal jurisdiction has the burden to prove that jurisdiction." *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015) (citing *Russell v. Lundergan–Grimes*, 784 F.3d 1037, 1045 (6th Cir. 2015)). Thus, "where subject matter jurisdiction is challenged under Rule 12(b)(1), as it was here, the *plaintiff* has the burden of proving jurisdiction in order to survive the motion." *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 817 (6th Cir. 2017) (quoting *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)).

There are two types of motions to dismiss for lack of subject-matter jurisdiction: facial and factual attacks. *Gentek Bldg. Prods., Inc. v. Sherman-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A facial attack questions merely the sufficiency of the pleading. When reviewing a facial attack, a district court takes the allegations in the complaint as true. *Id.* If those allegations establish federally cognizable claims, jurisdiction exists. *Id.* A factual attack instead raises a factual controversy concerning whether subject-matter jurisdiction exists. *Id.*

Where there is a factual attack on the subject-matter jurisdiction of the court under Fed. R. Civ. P. 12(b)(1), no presumptive truthfulness applies to the complaint's allegations; instead, the court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter jurisdiction does or does not exist. *Gentek Bldg. Products, Inc.*, 491 F.3d at 330. "[T]he district

court has considerable discretion in devising procedures for resolving questions going to subject matter jurisdiction[.]" *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 327 (6th Cir. 1990).

Defendants attack, among other things, Plaintiffs' Article III standing.[9] This constitutes a challenge to subject-matter jurisdiction because Article III "[s]tanding is a jurisdictional requirement[,]" and "[i]f no plaintiff has standing, then the court lacks subject-matter jurisdiction." *Tennessee General Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019). Like any challenge to subject-matter jurisdiction generally, a challenge specifically to the plaintiff's standing can be in the form of either a facial attack or a factual attack. *Kale v. Procollect, Inc.*, No. 2:20-CV-2776-SHM-TMP, 2021 WL 2784556, at *2 (W.D. Tenn. July 2, 2021) ("Challenges to standing can be facial or factual."); *In re Saffold*, 373 B.R. 39, 43 (Bankr. N.D. Ohio 2007) ("A challenge to standing may be either a facial attack on a pleading or a factual attack.").

"A facial attack on standing challenges the legal sufficiency of the complaint, whereas a factual challenge against standing questions whether the complaint's factual assertions reflect reality." *Shumway v. Neil Hosp., Inc.*, No. 1:21-cv-01059-STA-jay, 2021 WL 5181754, at *1 (W.D. Tenn. Nov. 8, 2021) (citing *Ohio Nat. Life Ins. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).

In their Memo, Defendants appear to characterize their challenge to standing as a factual one rather than a facial one. For example, in their discussion about the legal standard applicable to a motion to dismiss for lack of subject-matter jurisdiction, Defendants describe the standard applicable to a factual attack on subject-matter jurisdiction in a manner that conveys an assumption that it is in fact a factual attack that is involved here:

---

[9] As stated above, Defendants seek dismissal on other grounds in addition to standing, including that (according to Defendants) Plaintiff's claims are subject to the defenses of sovereign immunity, laches, and limitations. The Court addresses only the issue of standing because it is dispositive of whether the Court can proceed to hear this case at all.

> There is no presumption that the factual allegations in the Complaint are true and the court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.), cert denied, 513 U.S. 868 (1994). The court has wide discretion to consider matters outside the pleadings. *Id*.

(Doc. No. 32 at 3).[10] Despite Defendants' recitation of the standard applicable to a factual attack on standing, the Court finds that Defendants argument as to Plaintiffs' lack of standing is best characterized as a facial attack on the sufficiency of the Complaint itself. Defendants argue, generally, that because the Complaint does not—and cannot—allege that Defendants have authority to prosecute Plaintiffs for violating Sections 115(b) or (c), the Complaint has not plausibly alleged that Plaintiffs face actual present harm or a significant possibility of future harm or that any such threat of harm is traceable to Defendants or likely to be redressed by the relief Plaintiffs seek (i.e., the Complaint has not plausibly alleged that Plaintiffs have standing to sue). (*See* Doc. No. 32 at 6). Moreover, Defendants do not rely on matters outside of the Complaint to make their challenge to standing.

Therefore, the Court will construe Defendant's attack as a facial one. So in assessing whether it lacks jurisdiction as Defendants claim, the Court will consider only the sufficiency of the Complaint and "accept the allegations set forth in th[at] complaint as true." *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579 (6th Cir. 2014).

<u>DISCUSSION</u>

## I.     Article III Standing, Generally

The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Standing is a core component of this "case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The requirement

---

[10] Defendants contrast this standard with the standard for a motion to dismiss under Rule 12(b)(6) whereby the court must accept as true all of the allegations contained in the complaint. (*See* Doc. No. 32 at 3).

of standing "ensure[s] that federal courts do not exceed their authority" by "limit[ing] the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). As just indicated, standing is a jurisdictional requirement. *See Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915–16 (6th Cir. 2002). Thus, if no plaintiff has standing, the court lacks subject-matter jurisdiction. *See Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017).

To have standing, a plaintiff must show that: (1) he suffered an injury, which means "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical[;]" (2) the injury was caused by the person sued; and (3) a court can likely redress the injury. *Lujan*, 504 U.S. at 560 (internal citation and quotation marks omitted). Where, as here, a plaintiff seeks declaratory and injunctive relief with respect to a statute (for example, a declaration that the statute is unconstitutional and an injunction prohibiting the defendant from enforcing it because it is unconstitutional), the plaintiff may challenge the enforcement of a statute before the actual consummation of an injury-in-fact. *See Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). However, "when seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review." *Id.* "During the pleading stage, the burden remains on the plaintiffs to clearly allege facts that demonstrate each element of standing." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)).

Importantly, "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). Plaintiffs "must demonstrate standing for each claim [they] seek[] to press." *DaimlerChrysler Corp v. Cuno*, 547 U.S. 332, 352 (2006). Moreover, Plaintiffs "must demonstrate

standing separately for each form of relief sought." *Id*. Likewise, Plaintiffs must allege "how the requested relief against *each* of the defendants could redress plaintiffs' alleged injuries-in-fact."[11] *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022). In other words, standing is defendant-specific. This principle is neither intuitive nor self-evidently reflected in the three elements of standing, but on second glance it well may be reflected in the requirement that the injury would be redressed by a favorable court decision—meaning a favorable court decision against the *particular defendant(s)* involved.

Ashe and Lawson assert that they have suffered an injury-in-fact in that they are unable to vote in a primary election in Tennessee without fear of being criminally prosecuted. The League similarly claims injury on behalf of its members who fear prosecution, and it also asserts that Section 115(b) prevents it from achieving its primary purpose of accurately informing voters about voting laws in Tennessee.

## II.     Plaintiffs' Standing to Challenge Section 115(b)

### A.     Ashe and Lawson's Standing to Sue Defendants for Violating Section 115(b)

Defendants argue that Ashe and Lawson cannot show that the relief they seek is traceable to Defendants or that such relief would redress Plaintiffs' purported injuries. This is so, according to Defendants, because Defendants lack the authority to prosecute anyone under Sections 115(b) and (c)—leaving others (namely, authorized prosecutors) free to initiate such prosecutions even if Defendants are enjoined. In making this argument, Defendants rely on *Universal Life Church Monastery Storehouse v. Nabors*, wherein the Sixth Circuit addressed the plaintiffs' standing to sue then-Tennessee Attorney General Herbert Slatery. 35 F.4th at 1032. The Sixth Circuit stated that "[w]hat plaintiffs must show to have standing to seek an anti-enforcement injunction (or

---

[11] Notably, however, only one plaintiff must demonstrate standing for the case to move forward on a claim against any one defendant. *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015).

related declaratory relief) is that [the Tennessee Attorney General] can and may take some enforcement action against them." *Id*. The Sixth Circuit held that the plaintiffs could not make this showing (and therefore, could not establish standing to sue the Tennessee Attorney General) because the Tennessee Attorney General did not have the power to initiate criminal prosecutions. *Id*. (citing TCA § 8-6-109). The court wrote:

> Tennessee's Attorney General is limited to handling appeals, reporting court decisions, offering advisory opinions, suing to recover public funds, and defending the constitutionality of state statutes. TCA § 8-6-109. It's the district attorneys general, by contrast, that actually initiate criminal enforcement proceedings. See TCA § 8-7-103(1). So there is no imminent prosecution that a federal court could coerce the Attorney General to refrain from undertaking.

*Id*.

The court further stated that "[t]he relevant question is not whether the Tennessee Attorney General may defend the constitutionality of the statute, but whether he can prosecute plaintiffs under it." *Id*. Because the Tennessee Attorney General lacked the power to prosecute the plaintiffs under the relevant statute, the plaintiffs could not establish standing to seek an anti-enforcement injunction against the Tennessee Attorney General. *Id*.

Like the plaintiffs in *Universal Life*, Plaintiffs are unable to show that enjoining Defendants from enforcing Section 115(b) is likely to redress their purported injury, because Defendants lack the authority to prosecute Plaintiffs under Section 115(b). Skrmretti, Tennessee's current Attorney General, is empowered in relevant part only to "*request* that the Coordinator of Elections conduct investigations into, and report violation of, election laws." (Doc. No. 1 at ¶ 21) (citing Tenn. Code Ann. § 2-11-202(a)(5)(C)(i)) (emphasis added). Goins, the Tennessee Coordinator of Elections, has, in relevant part the power to: "[g]enerally supervise all elections," "advise election commissions, primary boards, and administrators of elections as to the proper methods of performing their duties," and to "investigate or have investigated by local authorities the

administration of the election laws and report violations to the district attorney general or grand jury for prosecution . . . ."[12] (Doc. No. 1 at ¶ 20) (quoting Tenn. Code Ann. § 2-11-202(a)(1), (3), (5)(A)(i)). And Hargett, the Tennessee Secretary of State, has the power merely to "oversee[] the State's election process," (*id*. at ¶19) and "appoint[] the state's Coordinator of Elections (Goins), who serves at the pleasure of the Secretary[.]"[13] (Doc. No. 34 at 4).

Thus, Defendants have investigatory and/or supervisory powers related to the enforcement of Sections 115(b) and (c), but they lack prosecutorial authority. Moreover, like the Tennessee Attorney General in *Universal Life*, Defendants lack even the power to bring about prosecutions of individuals under Section 115(b) indirectly by commanding district attorneys general to prosecute. *See Universal Life,* 35 F.4th at 1032. Given that Defendants lack the power to prosecute (or to command the district attorneys general to prosecute) individuals for violating Section 115(b), Plaintiffs' purported injury (*i.e*., fear of prosecution) is neither fairly traceable to Defendants nor likely to be redressed by enjoining Defendants from enforcing Section 115(b).

Plaintiffs argue that even in the absence of a defendant's direct prosecutorial authority, standing may exist as to the defendant if the plaintiffs could show that the defendant could "indirectly entice" prosecution by someone (an authorized prosecutor) not named as a defendant in the lawsuit. In so doing, they rely on dicta in *Universal Life* stating that the plaintiffs came "close[]" to alleging that the Tennessee Attorney General—by issuing interpretive opinions "denigrating" the relevant ordinances—was "indirectly enticing" district attorneys general to prosecute. (*See* Doc. No. 34 at 7). However, the court concluded that an injunction forcing the

---

[12] Tenn. Code Ann. § 2-11-202(a) frames this authority, (and, for that matter, all authority given to the Coordinator of Elections under the statute) as a duty ("the coordinator of elections shall . . .").

[13] Plaintiffs assert that Hargett also has, by virtue of his power to appoint the Coordinator of Elections who serves at his pleasure, authority over any investigations by the Coordinator of Elections (Goins) into alleged election law violations. (Doc. No. 34 at 4).

Tennessee Attorney General to retract those opinions and refrain from further opinions[14] would not satisfy redressability because it would not relieve the plaintiffs' injury. *Universal Life,* 35 F.4th at 1033. "Even absent those opinions . . . the district attorneys general would still have the same duty to 'prosecute according to law.'" *Id*. (quoting Tenn. Const. art. IV, Section 5). Because the district attorneys general would still have an independent duty to "prosecute according to law," the Tennessee Attorney General's interpretive opinions—even if they might be characterized as enticing prosecution—were not sufficient to meet the redressability requirement.

Plaintiffs argue that "[u]nlike the Attorney General in *Universal Life*, Defendants here *can* 'entice' prosecutions" because Skrmetti and Goins are authorized to investigate violations of Section 115(b) and refer them for prosecution. (Doc. No. 34 at 7). But as alluded to above, *Universal Life* does not stand for the proposition that plausibly alleging enticement is sufficient to confer standing. To the contrary, *Universal Life* teaches that a plaintiff's fear of prosecution cannot be redressed by an injunction against a defendant who lacks prosecutorial power when an authorized prosecutor not named in the lawsuit has a constitutional duty to prosecute. This remains true even where the defendant has taken some action to entice prosecution by the authorized prosecutor. Thus, Plaintiffs' "indirect enticement" argument fails for the same reason as in *Universal Life*—namely, because even absent any investigation or referral by Defendants regarding violations of Section 115(b), district attorneys general across the state have "the same duty to 'prosecute according to law.'" 35 F.4th at 1033 (quoting Tenn. Const. art. IV, Section 5). While the Court acknowledges the possibility that in a particular case a district attorney general could prosecute an individual under Section 115(b) who would not have been prosecuted absent

---

[14] This specific kind of relief (regarding Attorney General opinions in particular) requested in *Universal Life* is not requested by Plaintiffs in the present case. Nevertheless, the dicta from *Universal Life* on which Plaintiffs rely conceivably could still be applicable and helpful to Plaintiffs in the present case. But in fact, it is not helpful to Plaintiffs, for the reasons discussed herein.

investigation or referral that was initiated by one of the Defendants, this possibility ultimately is purely speculative. And such speculation is insufficient to create standing because the standard for redressability is "whether it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Parsons v. Dep't of Just.*, 801 F.3d 701, 715 (6th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC) Inc.*, 528 U.S. 167, 181 (2000)). The applicable principle is that mere speculation of potential future prosecution is not enough to support standing.

The principle was driven home to the undersigned just last year with unusual frankness— if not disdain—in *McLemore v. Gumucio*, No. 22-5458, 2023 WL 4080102, at *2 (6th Cir. June 20, 2023), in which an in-state plaintiff and out-of-state plaintiffs alleged standing based on the possibility of a particular auctioneering statute being enforced against them. Rejecting the undersigned's then-existing receptiveness to the notion that standing can be supported by the possibility of future prosecution—a broad view of standing much more consistent with Plaintiffs' view than with Defendants' view herein—the Sixth Circuit stated:

> [T]he out-of-state plaintiffs [have not] demonstrated any "substantial risk" of enforcement of the statute against them. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). And the "mere existence of a statute" is not enough "to create a case or controversy within the meaning of Article III." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 293 (6th Cir. 1997). Nor is this case ripe, given that "it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).
>
> The district court thought this case was justiciable on the ground that "one can easily imagine [the] State (perhaps under different executive branch leadership) changing its tune in the future; in the throes of enforcement zeal, the State someday could insist that there is no such geographical limitation" to the Tennessee auctioneering statute's enforcement. *McLemore*, 593 F. Supp. 3d at 778. But the Supreme Court has been clear that such "some day" potentialities "do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564. Neither do mere imaginings. This case is non-justiciable.

*Id.* at *2. Although the undersigned does not see eye-to-eye with *McLemore* in several respects, although *McLemore* is distinguishable from the instant case in one respect,[15] and although *McLemore* is not precedential, the undersigned will heed the above-quoted admonitions in *McLemore*, treating them as a here-applicable, context-specific illustration of what *Parson*s made clear: mere speculation is not enough to support standing. Applying this principle to the current issues of traceability and redressability in the instant case, those required elements of standing cannot be established here by mere speculation that there *could be* a potential future prosecution and: (i) that *if* there was, that would constitute an injury traceable to Defendants; and (ii) that such injury can be mitigated by enjoining Defendants in a way that makes a prosecution less likely in the first place. Such speculation is not enough to establish an injury in the first place—let alone an injury traceable to Defendants in particular or redressable by enjoining Defendants in particular.

Accordingly, the Court finds that Ashe and Lawson are unable to establish standing because they have not shown that their purported injury (i.e., fear of prosecution under 115(b)) is fairly traceable to Defendants or likely to be redressed by an injunction prohibiting Defendants from doing something they already lack the power to do—namely, prosecuting Plaintiffs under 115(b).

B. <u>The League's Standing to Sue Defendants for Violating Section 115(b)</u>

An organization may have either standing in its own right (i.e., "organizational standing"), *MX Grp., Inc. v. City of Covington,* 293 F.3d 326, 333 (6th Cir. 2002), or so-called "associational standing"—meaning standing on behalf of its members—"when its members would otherwise

_____

[15] In *McLemore*, unlike in the present case, state authorities (at least, those in place at the time the relevant arguments were made in the district court), affirmatively disavowed an intent to enforce the statute in the manner that the plaintiffs conjectured. This fact made the injury to those plaintiffs even more speculative than is the injury to Plaintiffs herein. But the point of *McLemore*—that speculative fear of enforcement is insufficient to convey standing—applies here.

have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc.*, 528 U.S. at 181. Therefore, an organization can assert standing in one or both of two ways: (1) on its own behalf because it has suffered a palpable injury as a result of the defendants' actions ("organizational standing"); and (2) as a representative of its members who would have standing to sue individually ("associational standing"). *Shelby Cnty. Advocs for Valid Elections*, 2019 WL 4394754, at *5.

i. *Associational Standing*

Plaintiffs claim associational standing on behalf of members of the League who fear prosecution. But for the same reasons that Ashe and Lawson's purported fear of prosecution does not confer standing, fear of prosecution held by any individual members of the League likewise is too speculative to constitute an injury-in-fact, is not traceable to Defendants, and is not redressable by enjoining Defendants. Accordingly, the Court rejects Plaintiffs' attempt to assert associational standing.

ii. *Organizational Standing*

As noted above, the League claims organizational standing as well. To demonstrate organizational standing, a plaintiff organization must show that it suffered a "palpable injury as a result of the defendants' actions." *MX Grp.*, 293 F.3d at 333. A plaintiff organization seeking to establish organizational standing must also meet the three elements of standing: an injury-in-fact, fairly traceable to the defendant's conduct, that is likely to be redressed by a favorable decision from the court. *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014). But an organization's "mere interest in a problem" cannot confer standing. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (internal citation omitted). Rather, the plaintiff organization must show that its "ability to further its goals has been 'perceptively [sic] impaired' so as to constitute far more

than simply a setback to the organization's abstract social interests." *Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710, 716 (6th Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

The League asserts two injuries, both of which (according to the League) have "perceptibly impaired" the League's activities. First, the League argues that it has been injured because it may need to divert its resources away from expenditures it would make in the absence of Defendants' conduct. Second, the League asserts that it cannot fulfill its organizational mission without knowing what Section 115(b) prohibits.

Beginning with its diversion-of-resources argument, the League alleges that it must budget "approximately $3000"—which would otherwise be spent on voter-registration and get-out-the-vote efforts—to respond to voter confusion, intimidation, and uncertainty created by Sections 115(b) and (c). (Doc. No. 1 at ¶ 18). Defendants argue that spending money on voter education—something the League already does and has done for years as part its mission—is not an injury for purposes of Article III standing. Plaintiffs respond by citing to *Online Merchants Guild v. Cameron*, 995 F.3d 540 (6th Cir. 2021), wherein the Sixth Circuit (in Plaintiffs' view) held that expenditures by a plaintiff organization made in response to a defendant's purportedly illegal action is an injury-in-fact for purposes of Article III standing, even if the new expenditures are part of the organization's mission.

In *Online Merchants*, the Kentucky Attorney General sent a letter informing a company (the plaintiff) that he was opening an investigation into the plaintiff's possible price-gouging activities.[16] 995 F.3d at 546. As part of that investigation, the Kentucky Attorney General also sent

---

[16] The Kentucky Attorney General initiated its investigation in response to complaints by Kentucky consumers of price gouging involving N-95 masks and other essential goods by third-party sellers on Amazon, "including markups of up to 1,951%. *Id*. at 545. The investigation into the plaintiff in particular

subpoenas and civil investigative demands (CIDs) to the plaintiff stating that he had "reason to believe" that the plaintiff was violating Kentucky laws prohibiting price-gouging. *Id*. The plaintiff filed a lawsuit seeking injunctive and declaratory relief to prevent the Kentucky Attorney General from enforcing the relevant price-gouging laws. *Id*. The plaintiff claimed that it had organizational standing based on the fact that it shifted its expenditure of organizational resources to respond to the investigation. *Id*. at 548. The Kentucky Attorney General—like Defendants in this case— argued that the plaintiff's "expenditures [failed] to establish direct organizational standing because they fall within [the plaintiff's] mission to advocate for the interests of online merchants." *Id*. In making this argument, the Kentucky Attorney General relied on *Shelby Advocs. for Valid Elections v. Hargett*, 141 S. Ct. 257, 208 L. Ed. 2d 28 (2020), "for the sweeping proposition that if an organizational plaintiff's new expenditures 'are actually part of the organization's mission, then there is no diversion of resources and thus no injury-in-fact.'"[17] *Id*. at 549. But the Sixth Circuit rejected this argument, stating that this conclusion would contradict "various earlier—and thus controlling—cases . . . from this circuit, not to mention Supreme Court precedent, all of which affirm that within-mission organizational expenditures are enough to establish direct organizational standing." *Id*. at 548 (collecting cases).

Thus, Plaintiffs argue, *Online Merchants* defeats Defendants' argument that the League has not suffered an injury for purposes of standing based on the expenditures that the League anticipates it will need to make to address voter confusion. The Court disagrees.

---

was made in relation to the pricing of hand sanitizer and respirators on Amazon by one of the plaintiff's members. *Id*. at 546.

[17] The idea seems to be that an organization can hardly suffer injury merely from doing the very things it exists to do, and that this is true even if so doing requires expenditure of resources the organization otherwise would not need to expend.

First, this case is distinguishable from *Online Merchants* because there, the plaintiff *actually* expended organizational resources in response to the Kentucky Attorney General's conduct *prior* to filing the lawsuit. Here, by contrast, the League has alleged that it merely *anticipates* needing to spend (in the future) $3,000 in response to Defendants' conduct but offers nothing to suggest that it has already made such expenditures.

Second, while *Online Merchants* does teach that diversion of limited resources generally can be sufficient to confer Article III standing in the Sixth Circuit (even when such diversion is in furtherance of some aspect of the organization's mission), there are exceptions to that rule. In other words, the Court does not read *Online Merchants* as establishing a per se rule that diversion of limited resources confers standing to organizational plaintiffs. Rather, organizational plaintiffs asserting standing based on a diversion-of-resources theory must satisfy the basic requirements of standing, including that the plaintiff's injury not be hypothetical or speculative. *Lujan*, 504 U.S. at 560. The Sixth Circuit acknowledged as much in *Online Merchants*, stating that this Circuit has "rejected assertions of direct organizational standing where an overly speculative fear triggered the shift in organizational resources." *Id*. at 547 (citing *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 379 (6th Cir. 2020)).[18]

Here, the League fails to establish standing based on its diversion-of-resources theory because the League relies on an overly speculative fear as triggering the League's anticipated diversion of organizational resources. In *Online Merchants*, the Kentucky Attorney General served subpoenas and CIDs on the plaintiff as part of the Kentucky Attorney General's investigation into the plaintiff's alleged price-gouging activities. *Id*. at 548. To address this investigation, the plaintiff

---

[18] The court in *Online Merchants* distinguished that case from an earlier case in which the Sixth Circuit concluded that standing did not exist because the harm was speculative. *See Online Merchants*, 995 F.3d at 548 (distinguishing *Memphis A. Philip Randolph Inst*., 978 F.3d at 389).

had little choice but to divert resources that could have been expended elsewhere. For example, the plaintiff spent resources working with members on how best to respond to the subpoenas and CIDs, analyzing the complex web of investigations, and discussing open questions with its individual merchants who were confused and concerned about what they could and could not sell online. *Id.* This was a drastic shift in the plaintiff's use of resources, given that the plaintiff "spent little to no time on price-gouging issues" prior to the investigation. *Id.* (internal citations omitted). Thus, the Kentucky Attorney General's investigation—and more specifically, the subpoenas and CIDs served on the plaintiff in relation to that investigation—clearly triggered the plaintiff to shift its resources to respond to the investigation.

Here, by contrast, there is no clear impetus for the League to divert its resources elsewhere. Rather, what has the League *anticipating* the "need" to divert $3,000 from purposes for which it would otherwise be spent is a fear that is entirely speculative. The League anticipates the need to budget resources to "adequately respond to the voter confusion, intimidation, and uncertainty" created by Section 115(b) ahead of the 2024 primary election. (Doc. No. 1 at ¶ 18). However, the League does not offer any examples of widespread voter confusion or intimidation stemming from Section 115(b).[19] Moreover, the League does not adequately explain why a law that has been on the books for over 50 years is likely to suddenly confuse or intimidate voters.[20] The Complaint

---

[19] It is true that the Complaint alleges that Ashe and Lawson are confused by the requirements of Section 115(b) and fear prosecution that might result from their failure to comply with the law. (Doc. No. 1 at ¶ 84). The Court currently accepts these allegations as true even though they are seemingly undercut in Ashe's case by the fact that, as he himself puts it, he "co-sponsored the original legislation for Section 115(b) in 1972," (Doc. No. 34 at 14, n.11), and apparently did not see fit for more than a half a century to attempt to mitigate his alleged confusion. In any event, Ashe's and Lawson's own personal confusion does not demonstrate the existence of widespread voter confusion that the League must address by diverting its resources.

[20] As discussed above, organizational standing—as opposed to associational standing—requires a showing that the organization itself—as opposed to its members—has suffered a palpable injury. *MX Group*, 293 F.3d at 333. The League's argument that it must divert resources to address the fears of its members and,

points to several instances that (according to Plaintiffs) show that Defendants are ready and willing to enforce Section 115(b) via prosecution. (Doc. No. 1 at ¶¶ 39–42). But only one of these "threats of prosecution," as the Complaint describes them, was made by a defendant. (*Id.* at ¶ 39). Specifically, the Complaint alleges that in April 2022, Hargett gave a speech in which he stated "[p]eople need to understand when you go vote in a primary, you are supposed to vote in the primary in which you are a member of the party. . . . The DA could actually prosecute that if people are willingly going in and voting in the other party." (*Id.*). This statement hardly constitutes a threat to enforce Section 115(b) via prosecution; it is merely an undeniably true statement about a criminal statute based on the very nature of criminal statutes (which by definition are statutes enforceable via prosecution of violations thereof). Thus, the Court cannot reasonably infer from these allegations that widespread intimidation or confusion currently exists among voters. And without a basis for such a showing, the League has no "need" to budget $3,000 to address these purported concerns among voters. The League "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

In sum, the League alleges concerns that Defendants *might* begin enforcing a statute that has been on the books for over 50 years, that this possibility *might* cause voter confusion and/or intimidation, and that (if voters are in fact confused and/or intimidated) then the League would need to divert $3,000 to respond to that confusion and/or intimidation. But "'[a]llegations of *possible* future injury' are not sufficient [to constitute injury-in-fact]." *Id.* at 158 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also Lujan,* 504 U.S. at 565, n. 2, 567, n. 3;

---

more generally, Tennessee voters, could be viewed as an attempt at bootstrapping the alleged harm suffered by the League's members and Tennessee voters into a harm suffered by the League in order to establish organizational standing (given that its argument for associational standing has been rejected).

*Friends of the Earth, Inc.*, 528 U.S. at 190; *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979). Rather, the threatened injury "must be *certainly* impending."[21] *Id.* (quoting *Whitmore*, 495 U.S. at 158). Because that is not the case here, the League has failed to establish that it has suffered an injury for purposes of organizational standing.

The League relies also on *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) for the proposition that "consequent drain on the organization's resources" constitutes an organizational injury. (Doc. No. 34 at 9–10) (citing *Havens*, 455 U.S. at 379). In *Havens*, the plaintiff—a public interest organization (HOME) whose mission was to "make equal opportunity in housing a reality"—claimed it had organizational standing to challenge renting practices of the defendant, an apartment owner, that were allegedly discriminatory in violation of the Fair Housing Act of 1968. 455 U.S. at 368, 378. As part of a broader "racial steering" practice in which the defendant was allegedly engaged, the defendant lied to black renters, including a member of HOME, about whether any rental units were available. *Id.* at 366. The Supreme Court found that HOME had organizational standing because it "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Id.* at 379. The Court also found that this injury was "more than simply a setback to the organization's abstract social interests[.]" *Id.*

It is true that a drain on an organization's resources would constitute an organizational injury in some instances. But the Sixth Circuit has counseled against making such a finding where the plaintiff organization cannot tie its alleged injury to a legally recognized right. For example, in

---

[21] Notably, standing jurisprudence has treated the general requirement that an injury be "imminent" as "both a temporal and probabilistic concept." *See Protect Our Aquifer v. Tennessee Valley Auth.*, 654 F. Supp. 3d 654, 672 (W.D. Tenn. 2023) (citing *Lujan*, 504 U.S. at 566; *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). Thus, the Court must consider the likelihood that the League would need to spend $3,000 (or any amount of money) to address the alleged concerns of voters as it anticipates it will.

*Fair Elections Ohio v. Husted*, the Sixth Circuit denied standing to a voter outreach group (the AMOS Project) challenging state election laws. 770 F.3d at 461. The AMOS Group claimed it had organizational standing to sue over a state election law because "it would be required to divert its resources to retraining its volunteers and informing its members and constituents of the risks attendant with getting arrested during the weekend prior to the election." *Id*. at 459 (internal citations omitted).

The Sixth Circuit reversed the district court's conclusion that this alleged injury was sufficient to confer organizational standing. In doing so, the Sixth Circuit distinguished *Havens* by explaining that in *Havens*, unlike in *Husted*, the plaintiff (HOME) suffered a "distinct and palpable" injury to an enforceable right under the Fair Housing Act to truthful housing information. *Id*. at 460, n.1.[22] This right, which was intrinsic to HOME's activities of providing counseling and referral services for low-and moderate-income home seekers, was directly interfered with by the defendants deliberately providing misinformation to members of HOME. *Id*. Thus, HOME diverted its resources to counteract the defendant's misinformation in an effort to enforce its legally recognized right to truthful housing information. As the Sixth Circuit noted in *Husted*, the requirement that an organization tie its injury to a legally recognized right serves as an important standing limitation because without it "an advisor or organization can be deemed to have Article III standing merely by virtue of its efforts and expense to advise others how to comport with the law, or by virtue of its efforts and expense to change the law." *Id*. at 460.

---

[22] In *Husted*, the Sixth Circuit distinguished *Havens* also on the grounds that the plaintiff organization in *Havens* (HOME) sought damages, not an injunction. *Id*. (citing *Havens*, 455 U.S. at 378). As the Sixth Circuit pointed out, an allegation of awardable damages is a "classic basis for standing" and "plaintiffs who have standing to bring a damages claim do not necessarily have standing to bring a claim for injunctive relief." *Id*. (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). Likewise, *Husted* is distinguishable from this case because Plaintiffs do not seek an award of damages.

In contrast to the plaintiff organization in *Havens*, the plaintiff organization in *Husted* (the AMOS Project) did not point to any statute granting the organization a right that it had (and the enforcement of which could be aided via diversion of resources). And because the Amos Project did not point to any such statute, it could not be said that the Amos Project diverted its resources to protect against the interference of, or to enforce, any legally recognized right. Rather, the AMOS Project diverted its resources to advise others on how to comply with existing election law. *See id.*

The League likewise fails to tie its injury to a legally recognized right. The League states that its anticipated diversion of resources would be made to address voter confusion and intimidation. But the League does not (and cannot) point to any statute granting it an enforceable right to clearer information about voting requirements. Nor has the League alleged that Defendants have interfered with any such right by providing false information to the League or any of its members. In short, the League has not alleged any legally recognized right as a basis for organizational standing, and therefore it cannot rely on *Havens* to establish organizational standing. Because the League cannot establish injury-in-fact, it cannot show that it has organizational standing by a diversion-of-resources theory.

The League also alleges that Sections 115(b) and (c) prevent the League from fulfilling its primary mission of educating voters because it does not (and cannot) know how to accurately inform its members and the public about voting issues related to the primaries. (Doc. No. 1 at ¶ 18). But the League's purpose is not to offer legal advice. The League's "primary function," per the Complaint, is "providing voter information" to "empower voters and defend democracy." (Doc. No. 1 at ¶¶ 17–18). The League accomplishes its mission by "helping Tennessee citizens register to vote, educating voters about the issues that impact them, and encouraging voters to be

active participants in democracy through engaging with elected officials and their policy decisions." (*Id*. at ¶ 17).

The enforcement of Section 115(b) does not "perceptibly impair" this mission. Rather, the League may continue to engage in all of the conduct described above as furthering its mission regardless of its purported confusion as to what Section 115(b) prohibits. For example, the League can still encourage voters to register to vote in both primary and general elections. The League can also educate voters about the various issues that might impact them or their community by, for example, urging potential voters to elect representatives that will address what Plaintiffs perceive to be a vague law. Thus, the League has not shown that its "ability to further its goals has been 'perceptively [sic] impaired' so as to constitute far more than simply a setback to the organization's abstract social interests." *Greater Cincinnati Coal. for the Homeless*, 56 F.3d at 716 (citing *Havens*, 455 U.S. at 379).

Moreover, even if one or both of the League's purported injuries were sufficient to state an injury-in-fact for purposes of standing, the League has not stated how either purported injury is fairly traceable to Defendants. In order to establish traceability, "there must be a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. "As it is generally understood, traceability requires that a plaintiff's claimed injury flow from the defendant's conduct rather than the plaintiff's own actions or the actions of a third party." *Grow Michigan, LLC v. LT Lender, LLC*, 50 F.4th 587, 592 (6th Cir. 2022) (citing *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021)). As to the League's anticipated diversion of resources, the League argues that Hargett's statement acknowledging district attorneys' duty to prosecute individuals for violating Section 115(b) has caused widespread voter confusion and intimidation which, in turn, has caused the

League to at least anticipate the need to spend $3,000 to address voters' concerns.[23] But as explained above, the League has not alleged facts from which the Court could reasonably infer that Hargett's undeniably true statement that a district attorney "could . . . prosecute" individuals for violating the law has caused widespread voter intimidation or confusion. Thus, the League's decision to budget $3,000 to combat the mere possibility of voter confusion and intimidation cannot be fairly traced to Defendants' conduct.

Nor can the purported frustration of the League's mission be fairly traced to Defendants. Again, Defendants' enforcement of Section 115(b) would not hamstring the League's ability to engage in any of the conduct that (according to the Complaint) furthers its mission.

Finally, because the League's purported injuries are not traceable to Defendants, the relief sought by Plaintiffs would not redress the League's injuries.[24] Accordingly, the League cannot establish Article III standing to sue Defendants under Section 115(b).

### III.    Plaintiffs' Standing to Challenge Section 115(c)

Plaintiffs assert that they have standing to challenge the polling-place signage requirement in Section 115(c) because it "deters voting behavior and expressive conduct that accompanies voting." (Doc. No. 34 at 5). However, as Plaintiffs acknowledge, what Section 115(c) requires is for the officer of elections at each polling place to post a notice of Section 115(b) in a prominent, visible location within the polling place. (Doc. No. 1 at ¶ 36). Thus, Section 115(c) imposes a

---

[23] To the extent that the Complaint relies on other statements or incidents as contributing to the purported widespread voter intimidation and confusion (Doc. No. 1 at ¶¶ 39–42), the Court finds that such statements or incidents cannot be fairly traced to Defendants because those statements and incidents do not involve any Defendant; rather, they involve actors not named as defendants in this case.

[24] To the extent that the League suggests that it is the fear of prosecution of its members that hampers its ability to accurately educate voters, the Court finds that this injury would not be redressable via the instant claims, for the same reasons that Ashe and Lawson's purported injuries are not redressable—namely, that Defendants lack the authority to prosecute individuals for violations of Section 115(b).

requirement only on the officer of elections at each polling place. It does not require or prohibit anything (beyond what is already required/prohibited in Section 115(b)) of Plaintiffs. Nor does Section 115(c) threaten any civil fines or criminal punishment against individual voters. Accordingly, the Court does not see how Plaintiffs can establish an injury that is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. *Lujan*, 504 U.S. at 560.

Moreover, even if Plaintiffs could establish an injury-in-fact, Plaintiffs cannot show that enjoining Defendants from enforcing Section 115(c) would redress their injury. Plaintiffs argue that "[i]f Hargett and Goins are enjoined from enforcing Section 115(c), they will necessarily not advise, train, instruct, and otherwise administer elections officials to put up the sign Section 115(c) requires." (Doc. No. 34 at 6). Even if this were true, election officials would still be required by law (irrespective of any direction from Hargett and Goins) to post the notice at each polling place. Thus, Plaintiffs' assertion that their requested injunction would "necessarily give Plaintiffs the relief they seek" is speculative at best.

Therefore, the Court finds that Plaintiffs do not have standing to sue Defendants under Section 115(c).

CONCLUSION

For the reasons indicated herein, Defendants' Rule 12(b)(1) motion (Doc. No. 31) will be GRANTED, and as a result all claims against Defendants will be DISMISSED without prejudice for lack of subject-matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1).

An appropriate corresponding order will be entered.


*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE